[Civ. No. 10632. Third Dist. Nov. 21, 1963.]

METRO REALTY, Plaintiff and Appellant, v. THE COUNTY OF EL DORADO et al., Defendants and Respondents.

(Consolidated Cases.)

509

Beverly & Riley and Melvin E. Beverly for Plaintiff and Appellant.

Jack R. Winkler, District Attorney, for Defendants and Respondents.

PIERCE, P. J.—These are plaintiff's appeals from judgments in favor of defendant County of El Dorado in two actions consolidated for trial, the first, under Business and Professions Code section 11525, challenging as unreasonable an order by the county board of supervisors rejecting plaintiff's tentative subdivision map; and the second, an action urging invalidity of two zoning ordinances.

The county is studying a comprehensive countywide water development and conservation plan to meet the needs of its growing population. The U.S. Bureau of Reclamation, on November 17, 1960, acting under contract with El Dorado County Water Agency, made its report recommending a reservoir site in the Texas Hill area of western El Dorado County as a "most attractive possibility."

On the same day plaintiff contracted to purchase 188 acres

of land on Weber Creek in said Texas Hill area and thereafter submitted a tentative map proposing to subdivide the purchased acreage into homesites.

On April 24, 1961, Ordinance No. 456 (the first of the two ordinances challenged) was adopted by the board of supervisors under Government Code section 65806 as an urgency interim measure. It zoned plaintiff's property exclusively for agricultural and recreational purposes. Because of this plaintiff's subdivision map was rejected, both by the planning commission and supervisors of said county.

On November 7, 1961, said planning commission adopted a resolution declaring its intention to hold hearings for the adoption of a countywide water conservation and development plan and requested the supervisors to enact a comprehensive urgency interim ordinance imposing regulations on the development of lands within all of the potential reservoir sites under consideration. On November 13, 1961, the supervisors adopted such a measure, Ordinance No. 482. (This is the second ordinance attacked here by plaintiff.) The ordinance did not limit its application to plaintiff's land nor even to the lands within the potential Texas Hill reservoir site. It affected 31 potential sites throughout the county. Its restricting provisions will be discussed below. Ordinance No. 482 repealed Ordinance No. 456.

The grounds of plaintiff's attack upon these ordinances are: (1) that they are unconstitutional as in excess of the limits of the police power, and (2) they were invalid because enacted without notice to plaintiff. We uphold the validity of the second ordinance; do not pass upon the first because its status has become moot.

As stated above, the subject matter of plaintiff's first action is the order rejecting its tentative subdivision map. Business and Professions Code section 11525 provides: "Control of the design and improvement of subdivisions is vested in the governing bodies of cities and of counties" but "subject to review as to its reasonableness by the superior court .... ." The trial court found Ordinance No. 456 zoning plaintiff's lands as "agricultural and recreational" both valid and reasonable, a finding which plaintiff vigorously assails, contending it was unconstitutional "spot zoning."

We find it unnecessary to decide this question. Said Business and Professions Code section 11525 directs each county to adopt an ordinance designating standard specifications applicable to all proposed subdivisions generally. El Dorado County has done this. (Plaintiff's Exhibit No. 15.) Plain-

tiff's subdivision map shows on its face that it does not comply with this ordinance. Its access road was too narrow; no turnaround area was provided at the terminus of the road; the map was also deficient in other respects. The trial court's findings show noncompliance with the county's general subdivision regulations ordinance. Therefore, the action of the board of supervisors in rejecting the map was proper even if we assume that its assigned reason (conflict with zoning Ordinance No. 456) was open to challenge. Therefore, the judgment in the first action must be affirmed. (3 Witkin, Cal. Procedure, Appeal, § 76, p. 2234; *Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990].)

We turn now to the second action and the question of the validity of Ordinance No. 482.

No doubt plaintiff could file a revised subdivision map widening its access road and correcting the other general defects in its plan. Ordinance No. 482, however, if valid, would still forbid pro tempore any homesite subdivision.

Government Code section 65806, under which Ordinance No. 482 was adopted, provides that if a planning commission "intends to conduct studies within a reasonable time" preliminary to the adoption of a zoning ordinance, "the legislative body to protect the public safety, health and welfare, may adopt, as an urgency measure, a temporary interim zoning ordinance prohibiting such and any other uses which may be in conflict with such zoning ordinance." The section requires that passage be by a two-thirds vote; the life of the ordinance is limited to one year, with a maximum of two successive one-year extensions (after notice, hearing and only upon adoption by a 4/5ths vote).

As indicated above, the adoption of said Ordinance No. 482 followed a chronology of steps looking toward the formulation of a countywide water development and conservation plan. In 1954 an "El Dorado County Water Committee" was created by the county board of supervisors to assist it in problems relating to the county's water resources. This committee commenced its study of the problems for which it was created.

In 1959 the El Dorado County Water Agency was created by the state Legislature. (Stats. 1959, ch. 2139.) The county board of supervisors serves ex officio as its directors. The agency is empowered to develop and conserve the county's water resources.

The contract between the agency and the Bureau of Recla-

mation mentioned above was made in July 1960. By its terms the bureau was to make a report containing an appraisal of available water resources and the cost of delivery to designated areas in western El Dorado County to meet the county's increasing water needs.

The bureau's report to the water agency considered this problem and included the statement: "The most attractive possibility for doing this [i.e., affording an additional water supply] appears to be the conjunctive use of a Texas Hill reservoir and a pipeline to the main divide from the Sacramento Municipal Utility District's proposed White Rock powerplant penstock." The evidence discloses that a reservoir with a 25,000 to 30,000 acre-foot capacity was contemplated.

Next in chronological order was the submission and rejection of plaintiff's tentative subdivision map described above.

After this action, the county water committee, in cooperation with the planning department of the county, prepared a map and list of other potential reservoir sites; this in anticipation of countywide water development.

Meanwhile a second contract had been made between the county water agency and the Bureau of Reclamation, calling for a much more comprehensive feasibility investigation of water developments for western El Dorado County (including the Texas Hill reservoir). This study will cost $225,000, one-half of which will be borne by the county. The contract calls for this report to be completed in 1964.

The planning commission then on November 7, 1961, adopted a resolution declaring its intention to hold hearings for the adoption of a comprehensive water conservation and development plan and requested the supervisors to enact an interim ordinance imposing regulations on the development of lands within the 31 potential reservoir sites shown on the committee's list. The board of supervisors then adopted Ordinance No. 482.

This ordinance, as stated, regulated the use of all lands within the boundaries of these 31 potential sites. It prohibited subdivision of lands and the construction of dwellings: "provided that not more than one single-family dwelling or building may be erected: (a) [u]pon a parcel of land which is ten acres or more in size; or (b) [u]pon a parcel of land less than ten acres in size divided and conveyed by deed or written contract of sale executed prior to November 13, 1961."

The ordinance was declared to be an urgency measure, the facts giving rise to the emergency being the pendency of the comprehensive plan described above which would include "precise zoning regulations to implement the same," and it was stated: "uses contemplated on the land described herein would not conform to said plan or the precise zoning regulation being formulated for its implementation, thereby destroying the usefulness of said plan unless such contemplated uses are regulated immediately."

The Conservation and Planning Law (Gov. Code, §§ 65000 et seq.), of which said Government Code section 65806 relating to interim ordinances is a part, clearly contemplates, in Government Code section 65463, master plans of county development, including the element of conservation and development of water resources which element it is stated may cover: "(d) [r]egulation of the use of land in stream channels and other areas required for the accomplishment of the conservation plan."

In the case at bench we are not concerned with the limits of the regulatory powers of the county under an ultimately-to-be-adopted master plan as to limitations of land uses within reservoir and dam sites pending acquisition of those sites. Our problem here relates only to temporary regulation under an ordinance which by the express provisions of said section 65806 can have a life of three years only (i.e., one year with a maximum of two one-year renewals).

Also, as we attack the problem of decision, we bear in mind in addition to the temporary duration of the restrictions three factors established by the evidence which we deem significant: (1) plaintiff is not being singled out as a lonely object of regulation. The ordinance affects *all* new would-be home subdividers within 31 potential reservoir sites spread throughout the entire county; also (2) the lands here involved have been unused and unusable for generations. They are precipitous or hilly; rocky, brush-covered; (3) there are no subdivisions in the immediate vicinity. An attempt to launch a homesite development on plaintiff's lands would be a pioneering adventure.

Our question therefore narrows: Does adoption of an ordinance thus limited in its duration and application exceed the police powers of the county board of supervisors?

In asking us to declare that it does, plaintiff urges us to exercise a judicial veto in a field where courts tread not just lightly but on tiptoe. In the words of Chief Justice

Gibson (in *Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, at p. 461):

". . . [W]e must keep in mind the fact that the courts are examining the act of a coordinate branch of the government — the legislative — in a field in which it has paramount authority, and not reviewing the decision of a lower tribunal or of a fact-finding body. Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe upon constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations. The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations."

That is why many courts have said that every intendment is in favor of the constitutionality of the legislative act. (*Lockard* v. *City of Los Angeles, supra,* at p. 460.)

The trail-blazing zoning ordinance case in California, *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], sets forth the fundamental rules applicable to the determination of constitutionality in this type of case. It says that "any zoning regulation is a valid exercise of the police power which is necessary to subserve the ends for which the police power exists, namely, the promotion of the public health, safety, morals, and general welfare." The same opinion also states (on p. 484): "The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited."

But, as was pointed out in *Miller, supra* (at p. 484):

". . . It [i.e., the police power] is not, however, illimitable and the marking and measuring of the extent of its exercise and application is determined by a consideration of the question of whether or not any invocation of that power in any given case, and as applied to existing conditions, is reasonably necessary to promote the public health, safety, morals [citations), or general welfare of the people of a community. [Citations.]"

Numerous cases have stated that determination of the validity of a zoning ordinance will hinge upon whether it is reasonable or arbitrary and oppressive, and it has frequently been ruled that where these matters are fairly debatable, the legislative decision must not be interfered with. (*Lockard* v.

*City of Los Angeles, supra,* at pp. 461-462; *McCarthy* v.
*City of Manhattan Beach,* 41 Cal.2d 879, 885, 890 [264 P.2d
932]; *Consolidated Rock Products Co.* v. *City of Los Angeles,*
57 Cal.2d 515, 522 [20 Cal.Rptr 638, 370 P.2d 342].) The
case last cited states (on page 529) that zoning ordinances
are valid "where reasonable minds may differ as to the
necessity" of the particular regulation challenged.

When we apply these rules to the ordinance and facts
before us we find neither arbitrary action, oppression nor
unreasonableness. We are impressed by the temporary char-
acter of the restrictions which have been placed against the
plaintiff in the use of its lands, and we have weighed against
whatever hardship this temporary interruption of plaintiff's
plans may cause the fact that such restriction attends, and
is indeed necessitated by, a countywide water plan, the
execution of which would certainly be seriously impeded
and might be completely blocked should subdivision develop-
ments be permitted to proceed willy-nilly during the plan's
formulation stages.

A temporary interim ordinance was involved in *Miller* v.
*Board of Public Works, supra.* It was approved. The court
stated on page 496:

"It is a matter of common knowledge that a zoning plan
of the extent contemplated in the instant case cannot be
made in a day. Therefore, we may take judicial notice of
the fact that it will take much time to work out the details
of such a plan and that obviously it would be destructive of
the plan if, during the period of its incubation, parties
seeking to evade the operation thereof should be permitted
to enter upon a course of construction which might progress
so far as to defeat in whole or in part the ultimate execution
of the plan."

Zoning is but one of the instances of legislative exer-
cise of that regulatory power we call "the police power."

In the execution of any public works project certain
individuals will inevitably suffer hardship but "[t]emporary
injury resulting from actual construction of public improve-
ments is generally noncompensable. Personal inconvenience,
annoyance or discomfort in the use of property are not
actionable type of injuries." (*People* v. *Ayon,* 54 Cal.2d
217, 228 [5 Cal.Rptr. 151, 352 P.2d 519].) And in *Gray* v.
*Reclamation Dist. No. 1500,* 174 Cal. 622 [163 P. 1024], where-
in it was pleaded that construction of one levee of a flood
water bypass before the other levee would divert the water

onto, and damage, plaintiff's land during construction, our Supreme Court held (on p. 646) that this was a valid exercise of the police power because any damage which would occur to plaintiffs was *"prospective temporary consequential damage"* (italics supplied) and the court added: "all this under the state's plan of vast magnitude and importance to abate, on behalf of the whole state, as well as for the benefit of private land owners, including these plaintiffs, flood conditions ... " etc.

The ordinance with which we deal here is of a type conveniently referred to as "stop-gap" or "incubation period" zoning ordinances. Cases dealing with the validity of such ordinances are collected in 136 American Law Reports 844. We substitute reference to the note for extensive citation. *Miller* v. *Board of Public Works, supra,* and *Lima* v. *Woodruff,* 107 Cal.App. 285 [290 P. 480], are cited therein showing California aligned with the majority of jurisdictions which uphold such ordinances.

Reasonableness, as we have seen, is the yardstick by which the validity of a zoning ordinance is to be measured and reasonableness in this connection is a matter of degree. A temporary restriction upon land use may be (and we feel *is* under the facts here) a mere inconvenience where the same restriction indefinitely prolonged might possibly metamorphize into oppression.

Plaintiff relies heavily upon *Kissinger* v. *City of Los Angeles,* 161 Cal.App.2d 454 [327 P.2d 10], but that was a case where, in an area already generally devoted to multiple family dwellings, the city "spot-zoned" plaintiff's lands limiting them to a single-family land use; this for the actual purpose to depress their value for possible cheaper acquisition by the city later for an airport runway (although congestion of population was stated as the excuse). The ordinance was declared arbitrary and discriminatory. The case is distinguishable. In the first place, the ordinance was permanent. Also, plaintiff there was singled out for special treatment under which he alone had to suffer his lands to be restricted to an unsuitable use, while all adjoining lands enjoyed the privilege of usage he sought to make of his lands. Those are not the facts here.

Plaintiff urges that its lands are being depressed in value and points to the testimony of its expert who testified that for a subdivision of homesites the lands have a market value of $400 an acre whereas for agricultural and recrea-

tional use (permitted under the ordinance here involved) the value is less than $25 per acre. Plaintiff's brief states this evidence is without conflict in the record. That statement is not quite accurate. The witness testified: "This four hundred dollars is what a man would pay for the land, assuming that he could subdivide it and do what he wanted with it and eventually sell it off in small homesites." He also testified, however, that *with knowledge of a reservoir to be constructed*: "I don't think that under those conditions, a man would buy it. I mean, it's going to be a pretty difficult thing to sell."

It appears to us that plaintiff in blaming defendant's ordinance for his asserted hardship forgets that it is not just the ordinance but the fact that a plan is under contemplation which, if adopted, will place plaintiff's lands beneath a dam or under water that causes the depression in value to such lands for the time being.

Assuming no ordinance had been adopted, would not the same value depression exist? It would seem absurd to contend that any prospective buyer could be found to purchase a lot for a homesite with knowledge of the facts. And to attempt to subdivide for homesites and sell the lots without imparting knowledge of possible imminent threatened divestiture would be both fraudulent and forbidden by statute. (Bus. & Prof. Code, §§ 11010-11019.)

The evidence here shows the Texas Hill area where these lands lie is a prime reservoir site, the plan for which is now nearing completion and likely to be adopted within a reasonably short period of time. The testimony of plaintiff's own expert, quoted above, shows that no homeseeker would buy under these circumstances. Indeed, this seems self-evident. The only present value, therefore, which the lands would seem to have is a speculative one and this is not the fault of the restrictive ordinance. It is because of the pendency of the county's water development plan.

We do not deal here with legal or equitable considerations which may arise if and when reservoir sites are hereafter established and the county is bargaining with plaintiff to acquire its lands. Then principles of the law of eminent domain will obtain. At the present time we consider only the temporary consequential hardship which plaintiff will suffer by this stop-gap ordinance, which holds long vacant and unused lands in status quo for the very brief life of this ordinance. No evidence in this case points to any loss impelling

us to hold that the limits of the police power have been exceeded.

■ For it is well settled that within those limits some uncompensated hardships must be borne by individuals as the price of living in a modern enlightened and progressive community. Except for the payment of this inconsiderable price of temporary inconvenience and even hardship, a far greater toll would be exacted not only from the public generally, but particularly from the class to which plaintiff belongs, the land developer, in the delays, hindrances and perhaps prevention of construction of all public betterment projects.

Zoning ordinances are not infrequently attended by hardships to individuals, as are other exercises of the police power: they were exacted of the petitioner in *Miller* v. *Board of Public Works, supra,* who was thwarted in his project to construct a four-family flat; of the landowner in *Lockard* v. *City of Los Angeles, supra,* whose plans to construct a manufacturing plant were frustrated; of the plaintiff in *McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879 [264 P.2d 932], who was required to leave his property for ''beach and recreational'' purposes; and of the landowner in *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, who was permanently forbidden to develop a rock quarry, the only valuable use to which his lands could apparently be put. We cite these few illustrative cases of uncompensated hardship out of many as being instances where the limits of the police power had to be given far greater elasticity than under the facts of this case.

■ We hold that the interim zoning ordinance No. 482 adopted by the County of El Dorado is neither arbitrary nor oppressive but a reasonable exercise of the police power.

■ Nor is it invalid, as contended by plaintiff, for want of notice given before its adoption. Government Code section 65806 neither expressly provides for notice nor does it contemplate any. The reason no notice is required is that the ordinance is, as its name states, an ''urgency'' measure, the very purpose of which to preserve the status quo would be destroyed if notice and hearing were required. When the permanent plan and a zoning ordinance thereunder are before the county for adoption, notice and a hearing will be required as an essential part of procedural due process. (*Gilgert* v. *Stockton Port Dist.,* 7 Cal.2d 384, 391 [60 P.2d 847].) But on the issue that notice is required as a condition

to the adoption of an urgency measure this is not a case of first impression. Nonrequirement of notice was declared in *Mang* v. *County of Santa Barbara,* 182 Cal.App.2d 93 [5 Cal.Rptr. 724], and the rule there asserted has inferred support from the holding in *Miller* v. *Board of Public Works, supra,* and *Lima* v. *Woodruff, supra.*

The judgments in both actions are affirmed.

Schottky, J., and Friedman, J., concurred.