[L.A. No. 30382. In Bank. Nov. 12, 1975.]

HFH, LTD., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES
COUNTY, Respondent;
CITY OF CERRITOS et al., Real Parties in Interest.

[L.A. No. 30383. In Bank. Nov. 12, 1975]

VON'S GROCERY COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES
COUNTY, Respondent;
CITY OF CERRITOS et al., Real Parties in Interest.

510

## COUNSEL

William J. Birney, Oliver, Stoever & Laskin, Richard Laskin, C. Edward Dilkes and Telanoff, Bobrowsky, Wallin & Dilkes for Petitioners.

Gordon Pearce, C. Edward Gibson, Luce, Forward, Hamilton & Scripps, C. Douglas Alford, Louis E. Goebel, Ronald W. Rouse, P. M. Barceloux, Burton J. Goldstein, Albert E. Levy, Ralph Golub, Keith S. Humphreys, Ronald E. Stewart, Goldstein, Barceloux & Goldstein, Paul Hamilton, Virgil Roberts, Pacht, Ross, Warne, Bernhard & Sears, M. Reed Hunter, Thom Seaton, Fulop, Rolston, Burns & McKittrick, Irwin M. Fulop, Marvin G. Burns, John Petrasich, Kenneth B. Bley, Edmund S. Schaeffer, Gideon Kanner, Donald G. Hagman, Michael Atherton, Malovos & Chasuk, Cox, Cummins & Lamphere, Desmond, Miller & Desmond, Fadem, Berger & Stocker, Feeney & Sparks, Bressani, Hansen & Blos, Jacobs, Jacobs, Nelson & Witmer, Nichols, Stead, Boileau & Lamb, Loube, Lewis & Blum, Thorpe, Sullivan, Workman, Thorpe & O'Sullivan, Ronald A. Zumbrun, Donald M. Pach and Thomas E. Hookano as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

J. Kenneth Brown, City Attorney, Ebben & Brown and Thomas F. Winfield III for Real Parties in Interest.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and E. Clement Shute, Jr., Deputy Attorneys General, John H. Larson, County Counsel (Los Angeles), S. Robert Ambrose and William F. Stewart, Deputy County Counsel, Burt

Pines, City Attorney (Los Angeles), Claude E. Hilker, Assistant City Attorney, Sally Disco, Deputy City Attorney, Fred Caploe, Atkinson, Farasyn & Smith, Rutan & Tucker, James E. Erickson, John J. Murphy, Roger A. Grable, Thomas P. Clark, Jr., Richard R. Hanna, Gary A. Owen, Kenneth C. Rollston, Carlyle W. Hall, Jr., Timothy B. Flynn, A. Thomas Hunt, John R. Phillips, Brent N. Rushforth and Fredric P. Sutherland as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**TOBRINER, J.**—We face in these mandate proceedings[1] the narrow issue of whether a complaint alleging that a zoning action taken by a city council reduced the market value of petitioners' (hereafter plaintiffs) land states a cause of action in inverse condemnation; we conclude that it does not. We also face numerous amici, some of whom urge on us significant changes in the law of liability and compensation in public land use regulation; we have concluded that neither the state and federal Constitutions nor public policy compel or counsel these changes.

We take the facts in this case from the allegations of the complaints, assuming as we must the truth of any properly pleaded factual allegations. (E.g., *Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Plaintiffs, a limited partnership (HFH) and a Delaware corporation (Von's), contracted to purchase the parcel in question from a common grantor. At the time the plaintiffs entered this contract with their grantor, the land in question lay in an agricultural zone and possessed no improvements of any kind. Plaintiffs conditioned the sale upon the grantor's ability to procure commercial zoning for the 5.87-acre tract; the City of Cerritos (the real party in interest) "in the latter part of the year 1965 or the early part of 1966" did classify the property as commercial, and in 1966 the plaintiffs became the owners of the parcel, according to the allegations of the complaint.

Plaintiffs thereafter submitted, and the city approved, a parcel map on which the plaintiffs subdivided the property in a manner appropriate for commercial uses. Subsequently, however, a period of some five years elapsed; during that time plaintiffs do not claim any development or

---

[1]The two cases before us originated in separate lawsuits concerning the same parcel of land. All parties agree that they present identical legal issues; they were consolidated in the Court of Appeal for this reason, and we shall hereafter refer to them as a single proceeding.

establishment of a more intensive use of the land. In July 1971, with the land still in this undeveloped state, according to the allegations before us, the city placed a moratorium upon more intensive uses of the property by temporarily zoning it as agricultural, the classification it had borne before plaintiffs acquired it. Plaintiffs do not allege that this moratorium interfered with any use of the land which they then planned nor do they allege that they then challenged this reclassification.

In October 1971, the city adopted a general plan indicating that some land in the area of plaintiffs' properties was appropriate for "neighborhood commercial uses," but did not alter the agricultural classification of plaintiffs' tracts. The 1971 general plan designated the bulk of the land in the area of plaintiffs' properties for "low density residential" uses. (City of Cerritos October 1971 General Plan Map; Evid. Code, § 452, subd. (b).)

Having apparently concluded that their interests would best be served by selling rather than developing the land, plaintiffs in early 1972 entered into a $400,000 contract of sale with Diversified Associates, Inc. (not party to this action) conditioned upon the reclassification of the tract as commercial. In an attempt to bring about the condition which would enable them profitably to sell their land, plaintiffs applied to the planning commission for commercial zoning of the tract. Both the commission and the city council, to which plaintiffs took an appeal, rejected this application, and instead zoned the property as single family residential. Concurrently with taking this action, the city zoned as commercial other properties on different corners of an intersection on which plaintiffs' land abuts. Plaintiffs, of course, had hoped to secure for their land a commercial classification in order to effectuate the conveyance of the land under the conditions of the contract of sale with Diversified Associates, Inc.

Plaintiffs allege that the situation of their properties rendered them "useless" for single family residential purposes; they do not, however, allege that the properties are useless for *other* purposes consonant with the zoning category in which they now lie.[2] As a consequence, according to plaintiffs, their land, which they purchased for some $388,000 and hoped to sell for $400,000, suffered a decline in market value to $75,000.

---

[2]Plaintiffs also complain of the deprivation "of any reasonably beneficial use of . . . said properties commensurate with its value." In the same section of their complaints, however, they allege a remaining fair market value of $75,000. The substantial value of their land rebuts the allegation that they cannot enjoy any reasonably beneficial use of it. As to use "commensurate with value," we note the tautological quality of this statement: "Value" is of course not an objective quality, but a social attribute of legal rights. Only if

■ ■■■■ The trial court sustained a demurrer without leave to amend to plaintiffs' cause of action in inverse condemnation and plaintiffs sought review.[3]

1. ■ *Inverse condemnation does not lie in zoning actions in which the complaint alleges mere reduction of market value.*

The courts of this state have recognized the constitutional values served by actions in inverse condemnation and have not hesitated to validate complaints appropriately employing this theory of recovery.[4] At the same time, we have recognized mandamus as the proper remedy for allegedly arbitrary or discriminatory zoning,[5] and have in appropriate

we concluded that plaintiffs enjoyed a vested right in a previous zoning classification would the city's action have deprived them of a use commensurate with value; our courts have, however, clearly and frequently rejected the position that landowners enjoyed a vested right in a zoning classification. (E.g., *Morse v. San Luis Obispo County* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710].)

[3]The trial court also sustained demurrers to other counts, granting leave to amend for purposes of adding a cause of action in mandate. These counts are not before us, for plaintiffs seek review only of the order sustaining the demurrer to the inverse condemnation count and pray for a writ of mandate directing the trial court to overrule that demurrer.

At oral argument plaintiffs and their amici curiae stressed the trial court's failure to allow amendment of their pleading. We recognize, of course, the requirement of liberality in permitting amendment of pleadings "in furtherance of justice." (Code Civ. Proc., § 473; e.g., *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19-20 [108 Cal.Rptr. 906, 135 A.L.R. 318].) Nothing in this policy of liberal allowance, however, requires an appellate court to hold that the trial judge has abused his discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment. Speaking to circumstances like those of the instant case, we have said: "[T]he burden is on the plaintiff to demonstrate that the trial court abused its discretion. [Citations omitted.] Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]; *Filice v. Boccardo* (1962) 210 Cal.App.2d 843, 847 [26 Cal.Rptr. 789].) Thus plaintiffs, while implying that they might in an unspecified manner amend their complaint to state a cause of action, fail to suggest any relevant facts with which they could supplement their pleading. We shall therefore determine this question below without reference to other possible facts which might enable them successfully to state a cause of action in inverse condemnation. (Cf. fn. 14, *infra*.)

[4]*Albers v. City of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]; *Holtz v. Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]; *Aaron v. City of Los Angeles* (1974) 40 Cal.App.3d 471 [115 Cal.Rptr. 162]; see generally 10 California Law Revision Commission Reports (1971) California Inverse Condemnation Law.

[5]E.g., *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 128 [109 Cal.Rptr. 799, 514 P.2d 111].

cases struck down land use restrictions which suffered from procedural or substantive deficiencies.[6]

We have never, however, suggested that inverse condemnation lay to challenge a zoning action whose only alleged effect was a diminution in the market value of the property in question. (E.g., *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710].) While this state of the law is sufficiently clear to admit of little doubt, we shall briefly review its development and basis.

Zoning developed slowly in the latter part of the 19th century. In its early stages it was frequently indistinguishable from the power to abate public nuisances,[7] but the first decades of this century saw the enactment of more comprehensive zoning laws and the development of the concept of city planning.[8] Shortly after these changes began to take effect, challenges in both state and federal courts raised the question of the constitutionality of these restrictions of the individual's previous ability to do with his land what he chose, bounded only by the laws of public and private nuisance. While the legal context in which this question arose differed from case to case, the courts of this state and the United States Supreme Court firmly rejected the notion that the diminution of the value of previously unrestricted land by the imposition of zoning could constitute a taking impermissible in the absence of compensation.[9] We have long adhered to that position.[10]

To demonstrate the settled nature of the issue before us we point out that the United States Supreme Court faced the same question in the first major constitutional challenge to modern zoning to come before it. (*Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016].) Tendering allegations almost identical to those

[6]*Broadway, Laguna, etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767 [59 Cal.Rptr. 146, 427 P.2d 810]; *Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776 [31 Cal.Rptr. 335, 382 P.2d 375]; *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66 [187 P.2d 686]; *Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213 [93 P.2d 93]; *Tustin Heights Assn.* v. *Bd. of Supervisors* (1959) 170 Cal.App.2d 619 [339 P.2d 914].

[7]*In re Hang Kie* (1886) 69 Cal. 149 [10 P. 327]; see *Mugler* v. *Kansas* (1887) 123 U.S. 623 [31 L.Ed. 205, 8 S.Ct. 273].

[8]California enacted its first statewide zoning law in 1917. (Stats. 1917, ch. 734, p. 1419.)

[9]E.g., *Welch* v. *Swasey* (1909) 214 U.S. 91 [53 L.Ed. 923, 29 S.Ct. 567]; *Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479].

[10]E.g., *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879 [264 P.2d 932]; *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515 [20 Cal.Rptr. 638, 370 P.2d 342]; see *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]; *State of California* v. *Superior Court (Veta Co.)* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281].

urged here, the appellee in *Euclid* claimed that "the tract of land in question is vacant and has been held for years for the purpose of selling and developing it for industrial uses, for which it is especially adapted, being immediately in the path of progressive industrial development; that for such uses it has a market value of about $10,000 per acre, but if the use be limited to residential purposes the market value is not in excess of $2,500 per acre. . . ." (*Id.* at p. 384 [71 L.Ed. at p. 309].) The court upheld the zoning against the claim that it constituted a taking of the property in question, settling some half century ago the question in the instant case.

The record of this court stands equally clear. In one of the seminal zoning cases coming before us, in considering and rejecting a contention that a zoning ordinance forbidding the establishment of a non-conforming use in a residential area unconstitutionally deprived the landowners of their property, we quoted with approval the following language of the Wisconsin Supreme Court: " 'It is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires. . . . [I]ncidental damages to property resulting from governmental activities, or laws passed in the promotion of the public welfare are not considered a taking of the property for which compensation must be made.' (Carter v. Harper [1923] 182 Wis. 148 [, 153]. . . .)" (*Miller v. Board of Public Works, supra,* 195 Cal. 477, 488.)

In an attempt to escape the clear import of such rulings plaintiffs emphasize that their complaint sounds in inverse condemnation, and that they therefore need only show some diminution in value rather than the arbitrary or confiscatory action imposed by the line of cases they seek to avoid. Several appellate courts in California have considered and rejected precisely this contention.[11]

The Court of Appeal in *Morse v. County of San Luis Obispo, supra,* 247 Cal.App.2d 600, spoke as follows in affirming a judgment of dismissal following the sustaining of a demurrer to a complaint seeking damages in inverse condemnation for the down-zoning of property:

---

[11]*State of California* v. *Superior Court (Veta Co.)* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]; *Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303 [112 Cal.Rptr. 919]; *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710]; *Smith* v. *County of Santa Barbara* (1966) 243 Cal.App.2d 126 [52 Cal.Rptr. 292].

"Plaintiffs are apparently attempting to recover profits they might have earned if they had been successful in getting their land rezoned to permit subdivision into small residential lots, but *landowners have no vested right in existing or anticipated zoning ordinances. (Anderson v. City Council* [1964] 229 Cal.App.2d 79, 88-90 [40 Cal.Rptr. 41].) A purchaser of land merely acquires a right to continue a *use* instituted before the enactment of a more restrictive zoning. [12] Public entities are not bound to reimburse individuals for losses due to changes in zoning, for within the limits of the police power 'some uncompensated hardships must be borne by individuals as the price of living in a modern enlightened and progressive community.' (*Metro Realty v. County of El Dorado* [1963] 222 Cal.App.2d 508. . . .)" (247 Cal.App.2d at pp. 602-603; italics added.)

We have only recently reaffirmed this principle in *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110;[13] we held in that case that a landowner could not employ inverse condemnation to challenge a zoning ordinance which required him to dedicate part of his land to the city as a condition of receiving a building permit: "The sixth cause of action sounds in inverse condemnation and alleges that the city has 'taken' plaintiff's property without compensation. Again, insofar as this cause of action is based upon the adoption of the general plan, there is no 'taking' of the property. . . ." (10 Cal.3d at pp. 127-128.)[14]

[12]Plaintiffs have failed to allege any existing use that was in nonconformity with the residential zoning classification now in effect; as far as the allegations of their complaint disclose, the land remains in the same state as the day the plaintiffs acquired it. Thus we need not here consider the question of a nonconforming use which the zoning authority seeks to terminate or remove; for plaintiffs have alleged that they enjoy a vested right, not in an existing *use,* but in a mere zoning *classification* on vacant land. This case therefore raises no issue of the constitutionality of a zoning regulation which requires the termination of an existing use. (Cf. *Livingston Rock etc. Co.* v. *County of Los Angeles* (1954) 43 Cal.2d 121, 127 [272 P.2d 4].)

[13]Plaintiffs argue that *Selby* is distinguishable because that case involved a uniform zoning classification while in the instant case plaintiffs have tendered allegations of discriminatory zoning classification. The asserted distinction lacks substance. Plaintiffs have a remedy in a mandate action against discriminatory zoning. (Code ·Civ. Proc,. § 1085.) Both their complaint and their briefs in this case, however, urge that the injury constituting the taking was the reduction in market value of the land. If such a reduction constituted an injury, it would occur regardless of the legality of the zoning action occasioning it; indeed we have held that the wrongfulness of the state's action is irrelevant in an inverse condemnation case. (E.g., *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 302 [90 Cal.Rptr. 345, 475 P.2d 441].) Thus, *if* plaintiffs have suffered an injury cognizable under California Constitution, article I, section 19, they stand entitled to compensation regardless of the public agency's wrongfulness in causing the injury. If, on the other hand, the city has acted arbitrarily or discriminatorily in passing the zoning ordinance of which they complain, plaintiffs stand entitled to relief by administrative mandate. Since governmental fault is irrelevant in an inverse condemnation action, *Selby's* discussion of the impropriety of inverse condemnation as a remedy for allegedly improper zoning is apposite to the instant case.

[14]Neither *Selby* nor this case presents the distinct problems arising from inequitable zoning actions undertaken by a public agency as a prelude to public *acquisition*

Plaintiffs' amici curiae, however, strenuously argue that California Constitution, article I, section 19 [former article I, section 14], which provides that "[p]rivate property may be taken *or damaged* for public use only when just compensation . . . has first been paid. . . ." (italics added) requires a ruling in their favor. Emphasizing the italicized words, plaintiffs contend first, that the California Constitution provides wider protection than the federal, and second, that the city in enacting the challenged zoning ordinances "damaged" their property and must therefore pay compensation. Only the first of these contentions is accurate.

This court has recognized the broader protections granted landowners by the addition of "or damaged" to the language of our state's compensation clause. (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]; *Reardon* v. *San Francisco* (1879) 66 Cal. 492 [6 P. 317]; cf. *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684 [119 Cal.Rptr. 491, 532 P.2d 139].) Yet in arguing that the additional phrase covers this case, plaintiffs mistake its meaning. Intended to reach

(*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391]); or from zoning classifications invoked in order to evade the requirement that land *used* by the public must be acquired in eminent domain proceedings (*Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205 [32 Cal.Rptr. 318]). Thus in *Klopping* the city in question made public announcements that it intended to acquire the plaintiff's land, then unreasonably delayed commencement of eminent domain proceedings, with the predictable result that the property became commercially useless and suffered a decline in market value. We held only that the plaintiff should be able to include in his eminent domain damages the decline in value attributable to this unreasonable precondemnation action by the city. The case thus in no way resembles the instant one, in which plaintiffs make no allegations that the city intends to condemn the tract in question.

Similarly in *Peacock* the county had refused to permit any development of the land in question (barring even the growth of most vegetation), while assuring the owner that the restrictions were of no consequence because the county intended to acquire the land for an airport. When, after denying the owner any use of his property for five years, the county renounced its intent to acquire the land, the Court of Appeal affirmed a trial court finding that "'[t]he exceptional and extraordinary circumstances heretofore enumerated . . . constituted a take [*sic*] of the subject property by inverse condemnation.'" (271 Cal.App.2d at p. 854.) Again one sees that the down-zoning rises to a taking only in connection with inequitable precondemnation actions by the public agency.

Finally, the cases hold that a public agency may not use a zoning ordinance to evade the requirement that the state acquire property which it uses for public purposes. Thus in *Sneed,* the county, rather than acquiring land for an air navigation easement, simply enacted a zoning ordinance forbidding any structure or vegetation more than three inches high and proceeded to operate flights over the area thus restricted. The Court of Appeal held that the plaintiff had stated a cause of action in inverse condemnation. Unlike the instant case, *Sneed* involved a zoning ordinance creating an actual public use of the property.

situations in which government activity damaged land without taking it, the provision in question does not apply to this case, in which undamaged land has allegedly suffered only a diminution of market value due to zoning action.[15]

Plaintiffs fail to distinguish between the "damaged" property which is a requisite for a finding of compensability and the "damages" by which courts measure the compensation due. Reasoning backwards, plaintiffs erroneously contend that since they can calculate damages (by measuring decline in market value), they must have been "damaged" within the meaning of the state Constitution.

Because a zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging, the trial court correctly sustained without leave to amend the demurrer to the cause of action in inverse condemnation.[16] (Cal. Const., art. I, § 19 [former art. I, § 14].)

2. *Plaintiffs may not seek damages in their pending mandate action.*

■ Plaintiffs also urge, alternatively to the proposition that inverse condemnation lies for any reduction in market value induced by zoning, the desirability of *interim* damages incident to the mandate action for which the trial court granted leave to amend. They argue that even if they ultimately succeed in their efforts to obtain a court decision invalidating the challenged zoning ordinance, they will still suffer an uncompensated loss of use of the property in question during the period between the enactment of the challenged ordinance and its demise. Arguing by implicit analogy to tort law, they urge that invalidation of the offending zoning ordinance will not suffice to compensate them for the damage they suffered by reason of its existence.

---

[15]Thus, while we have not hesitated to afford individuals the full measure of the protection indicated by the history of article I, section 19, no California case has ever interpreted the "or damaged" phrase of our state Constitution to cover mere diminution of market value of property due to zoning action.

[16]This case does not present, and we therefore do not decide, the question of entitlement to compensation in the event a zoning regulation forbade substantially *all* use of the land in question. We leave the question for another day.

In so arguing, however, they overlook the distinction between a tort suit and a mandate action: the former enables the wronged plaintiff to recover compensatory damages; the latter permits a party suffering from improper governmental action to correct administrative abuse. The cases have long acknowledged this distinction, one deeply rooted in the theory of our polity.

Courts have thus recognized that "[o]f course, it is not a tort for Government to govern. . . ." (*Dalehite* v. *United States* (1952) 346 U.S. 15, 57 [97 L.Ed. 1427, 1452, 73 S.Ct. 956] (Jackson, J., dissenting); *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 220 [11 Cal.Rptr. 89, 359 P.2d 457].) Justice Jackson's mot expresses both a principle of law and a necessity of rational government; both constitutional and institutional understandings require that legislative acts, even if improper, find their judicial remedy in the undoing of the wrongful legislation, not in money damages awarded against the state. (Cf. *City & County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403]; *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87 [3 L.Ed. 162].)

Thus acts within the area of legislative or administrative discretion have long enjoyed the shelter of immunity from tort liability; mere ministerial and "operational" acts, but not "basic policy decisions," have led to governmental tort liability. (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352].) This distinction finds expression directly relevant to the instant case in the California Tort Claims Act, which provides that "[a] public entity is not liable for an injury caused by adopting or failing to adopt an enactment. . . ." (Gov. Code, § 818.2.) The zoning ordinance of which plaintiffs complain is, of course, an "enactment" within the meaning of section 818.2. (Gov. Code, § 810.6.) We have recently held that an analogous tort immunity for the denial of a building permit (Gov. Code, § 818.4) constituted specific legislation qualifying the general rule that one may append a damage claim to a mandate action (Code Civ. Proc., § 1095). (*State of California* v. *Superior Court (Veta Co.), supra,* 12 Cal.3d 237, 244-247.) Plaintiffs suggest no distinction between Government Code section 818.2, which confers immunity for legislation, and Government Code section 818.4, which protects building permit decisions; thus *Veta's* holding applies equally to this case.

Nor may plaintiffs avoid the clear meaning of Government Code section 818.2 and *Veta* by arguing that the damage claim sounds in inverse condemnation rather than in tort. The fallacy in the argument inheres in its failure to recognize that inverse condemnation lies only for

a taking or damaging, while improper zoning actions may generally be attacked only by mandate. As we have shown above, plaintiffs have not alleged facts showing a taking or damaging; plaintiffs therefore may not add a damage claim to their pending mandate action.

3.  ██  *Although amici argue that "fairness" requires that inverse condemnation lie to challenge zoning actions, both considerations of policy and the limitations of judicial institutions lead to a contrary conclusion.*

Numerous amici who have entered this case on behalf of the plaintiffs urge that the constitutional values of "fairness" protected by the compensation clauses of the state and federal Constitutions require us to hold that inverse condemnation lies for any zoning action which substantially reduces the market value of any tract of land.[17] Without attempting a detailed discussion of the many points raised by amici or a review of the still more voluminous secondary literature on the taking issue,[18] we shall briefly indicate the grounds for our declining to do so.

In this case, as in most instances, zoning is not an arbitrary action depriving someone of property for the purpose of its use by the public or transfer to another; rather it involves reciprocal benefits and burdens which the circumstances of this case well illustrate. The shopping center which plaintiffs seem at various times to have contemplated erecting, would derive its value from the existence of residential housing in the surrounding area. That residential character of the neighborhood, we

[17] Citing *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684 [119 Cal.Rptr. 491, 532 P.2d 139], plaintiffs and their amici argue that the only consideration in this case relates to the "fairness" of the principle for which they contend; to this somewhat broad argument two answers present themselves. First, plaintiffs ignore the context of *San Diego;* the issue in that case was the distribution of a condemnation award which all conceded to be appropriate, not whether otherwise lawful state action constituted a "taking." Second, on a more basic level, we are deeply mindful of the "basic equitable principles of fairness" (*United States* v. *Fuller* (1973) 409 U.S. 488, 490 [35 L.Ed.2d 16, 20, 93 S.Ct. 801]) which shape this area of the law. We set forth below some of the considerations which cast doubt on plaintiffs' claim even under this broad and only tenuously legal rubric of constitutional "fairness."

[18] E.g., Berger, *A Policy Analysis of the Taking Problem* (1974) 49 N.Y.U. L.Rev. 165; Bosselman et al., The Taking Issue (1973); Costonis, *Development Rights Transfer: An Exploratory Essay* (1973) 83 Yale L.J. 75; Costonis, *The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks* (1972) 85 Harv.L.Rev. 574; Hagman, *A New Deal: Trading Windfalls for Wipeouts* (1974) 40 Planning 9; Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165; Rose, *A Proposal for the Separation and Marketability of Development Rights as a Technique to Preserve Open Space* (1974) 2 Real Est.L.J. 635; Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria* (1970) 44 So.Cal.L.Rev. 1.

may assume, results in part from the residential zoning of the area around the tract in question.[19] Plaintiffs in this case therefore find themselves in a somewhat uncomfortable position: they wish to reap the benefit in the form of higher market values of their land, of the restrictive zoning on other properties, but do not wish to bear the reciprocal burden of such zoning when it applies to their property. They thus would avoid the enforcement of residential zoning on their property while benefiting from its enforceability as to other property.

The long settled state of zoning law renders the possibility of change in zoning clearly foreseeable to land speculators and other purchasers of property, who discount their estimate of its value by the probability of such change. The real possibility of zoning changes for the tract in question finds ample demonstration in plaintiffs' insistence that their grantor procure such a change before conveying the land to them. Having obtained the benefits of such rezoning, but having failed to take advantage of it by building, they now assert that the termination of such rezoning rendered the city liable in damages. A distinguished commentator has thus described plaintiffs' situation: "[They] bought land which [they] knew might be subjected to restrictions; and the price [they] paid should have been discounted by the possibility that restrictions would be imposed. Since [they] got exactly what [they] meant to buy, it can perhaps be said that society has effected no redistribution so far as [they are] concerned, any more than it does when it refuses to refund the price of [their] losing sweepstakes ticket." (Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165, 1238; see also Berger, *A Policy Analysis of the Taking Problem* (1974) 49 N.Y.U.L.Rev. 165, 195-196.)

We are urged in this case to redefine the state and federal constitutional requirements of just compensation and to require payment for any zoning action which results in the substantial diminution of market value. That we do not do so reflects less our belief that no problems exist with the present law in this area than our conviction that legislative rather than judicial action holds the key to any useful reform. The welter of proposals for action to remedy the inequities in the scheme of land use regulation which fall short of invoking constitutional protection bear

[19]As one of plaintiffs' amici has written in another context, "[W]hile one can conceptually separate windfalls caused by government [e.g., by zoning actions] from those caused by the community, they are very hard to disentangle and measure." (Hagman, *A New Deal: Trading Windfalls for Wipeouts* (1974) 40 Planning 9; see also Costonis, *Development Rights Transfer: An Exploratory Essay, supra*, 83 Yale L.J. 75; Rose, *A Proposal for the Separation and Marketability of Development Rights as a Technique to Preserve Open Space, supra*, 2 Real Est. L.J. 635.)

ample witness to the ferment in this area.[20] Without passing on the desirability or legality of any of the proposed plans, we note that almost without exception they require legislative action for their implementation.[21] The complexity of the schemes proposed and the administrative machinery required for their effectuation obviously exceed anything readily feasible as a judicial remedy. Thus even if we were wholeheartedly to concede the wisdom of these plans, they would lie beyond our remedial powers.[22]

Finally, we note that our conclusion in no sense turns on the verbal distinction between "taking" and "police power." While these terms have a venerable history in discussions of this question, at best they have served as a shorthand method of indicating the result; neither hard nor easy cases are decided by such merely verbal lines. Rather, the far more basic considerations of reciprocity discussed above have shaped the decisions in this area,[23] decisions which reconcile property rights and social needs.

Plaintiffs in this case desire a change in long standing principles of the law of just compensation; they ask that we hold municipal zoning bodies liable for full compensation for any fall in market price due to zoning

[20] See footnote 18, *ante.*

[21] E.g., Costonis, *Development Rights Transfer: An Exploratory Essay* (1973) 83 Yale L.J. 75; Rose, *A Proposal for the Separation and Marketability of Development Rights as a Technique to Preserve Open Space, supra,* 2 Real Est. L.J. 635; Berger, *A Policy Analysis of the Taking Problem, supra,* 49 N.Y.U.L.Rev. 165; Michelman, *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, supra,* 80 Harv.L.Rev. 1165, 1252: "[T]he courts recognize that they cannot, through the enunciation of doctrine which decides cases, adequately stake out the limits of fair treatment; that if the quest for fairness is left to a series of occasional encounters between courts and public administrators it can but partially be fulfilled; and that the political branches, accordingly, labor under their own obligations to avoid unfairness regardless of what the courts may require."

[22] Moreover, we do not accept the suggestion of some of plaintiffs' amici that we recognize their cause of action as a way of goading the Legislature into actions felt to be desirable.

[23] Professor Michelman has written: "We have, in effect, been searching for a useful and satisfying way to identify the 'evil' supposedly combatted by the constitutional just compensation provisions, and have now suggested equating it with a capacity of some collective actions to imply that someone may be subjected to immediately disadvantageous or painful treatment for no other apparent reason . . . than that someone else's claim to satisfaction has been ranked as intrinsically superior to his own. . . . We should, then, consider carefully the extent to which the 'fairness' or utility rationale is already reflected, even if inexplicitly, in the judicial doctrines which presently compose the main corpus of our just compensation lore. My conclusion is that these doctrines do significantly reflect the line of thought which has been elaborated in these pages. . . ." Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, supra,* 80 Harv.L.Rev. 1165, 1224-1226.

actions. Yet plaintiffs can cite no case and little by way of other considerations to support their claim of entitlement to compensation by reason of a change in zoning. Hoping to build a shopping center, they purchased a tract previously zoned as agricultural land. For reasons which do not appear in the record, they did not build for five years, although no zoning impediments are alleged to have existed. Now they desire to sell that land at a profit to yet another developer and complain that the city has in the meantime concluded that its interests would best be served by residential rather than commercial development of the tract in question. Unable to make the desired profit from the sale of their land, they now seek to recoup it from the city; in so doing they mistake the law.

Zoning and other land use regulation, long an established feature of our lives, expresses both a concern for our present quality of life and our collective fiduciary responsibility to the future; that it bears this weight and expresses this concern does not mean that it may fall short of constitutional standards. These considerations do, however, caution us not capriciously to discard established constitutional boundaries in this area.

The alternative writs are discharged, and the peremptory writs denied.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., and Richardson, J., concurred.

**CLARK, J.**—I dissent.

Article I, section 19 of the California Constitution provides: "Private property may be taken *or damaged* for public use only when just compensation . . . has first been paid to . . . the owner." (Italics added.) While this court has usually applied the "or damaged" language in the context of physical damage to property (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818]), we have never limited compensation to physical damage. In fact, in *Reardon* v. *San Francisco* (1885) 66 Cal. 492 [6 P. 317], this court rejected such an interpretation, noting that the word *damaged* "refers to something more than a direct or immediate damage to private property, such as its invasion or spoliation. There is no reason why this word should be construed in any other than its ordinary and popular sense. It embraces more than the taking." (*Id.* at p. 501.) " 'The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to

show why the [government] should not pay for property which it destroys or impairs the value, as well as for what it physically takes.' " (*Bacich* v. *Board of Control, supra,* 23 Cal.2d 343, 351.)

The 80 percent decrease in fair market value of the subject property clearly constitutes damage to plaintiffs. The issue then is whether plaintiffs' damage is compensable under the California Constitution.

California has long recognized that while "the police power is very broad in concept, it is not without restriction in relation to the taking or damaging of property. When it passes beyond proper bounds in its invasion of property rights, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation. [Citations.]" (*House* v. *L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 388 [153 P.2d 950]; see *Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98].)

The point at which an injury becomes compensable is determined by balancing two fundamental—yet inconsistent—policy considerations. (*Bacich* v. *Board of Control, supra,* 23 Cal.2d 343.) "[O]n the one hand the policy underlying the eminent domain provision in the Constitution is to distribute throughout the community the loss inflicted upon the individual by the making of public improvements . . . . On the other hand, fears have been expressed that compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost." (*Id.* at p. 350.)

This balancing of policies in determining the point at which compensation is constitutionally mandated also has long been recognized by the United States Supreme Court. In *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321], the court noted that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits. . . . One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act." (*Id.* at p. 413 [67 L.Ed. at p. 325].)

As this court has recently recognized in viewing these conflicting policies, the ultimate test whether compensation is constitutionally

required, resolves itself into one of fairness. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 689 [119 Cal.Rptr. 491, 532 P.2d 139]; *Southern Cal. Edison Company* v. *Bourgerie* (1973) 9 Cal.3d 169, 173-175 [107 Cal.Rptr. 76, 507 P.2d 964].)[1]

We should address any problem of loss suffered by governmental action as one demanding application of a rule of fairness. (Cf. *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457].) Although earlier cases have failed to apply the rule of fairness to losses occasioned by downzoning, there is no justification for treating such losses differently from those due to other governmental action.

As Justice Traynor in his concurring opinion in *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 396-397, correctly pointed out, in determining fairness "[i]t is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property, but the loss to the owner [citations]."

In conjunction with the statement of Justice Traynor, the cautionary note of the United States Supreme Court in *Pennsylvania Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 416 [67 L.Ed. 322, 326], should not be overlooked. "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

The great harm which might result from downzoning was recognized in *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 516 [35 Cal.Rptr. 480], involving an ordinance of short duration. The court stated that although the temporary restriction was a mere inconvenience, "the same restriction indefinitely prolonged might possibly metamorphize into oppression."

Compensation in appropriate downzoning cases also meets the policy reflected by the eminent domain provision. As recently reaffirmed by this court in *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441], quoting from *Clement* v. *State Reclamation Board*

[1]"The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness . . . as it does from technical concepts of property law." (*United States* v. *Fuller* (1973) 409 U.S. 488, 490 [35 L.Ed.2d 16, 20, 93 S.Ct. 801], also quoted in *Southern Cal. Edison Co.* v. *Bourgerie, supra,* 9 Cal.3d at p. 175; see *Mid-way Cabinet etc. Mfg.* v. *County of San Joaquin* (1967) 257 Cal.App.2d 181, 192 [65 Cal.Rptr. 37].)

(1950) 35 Cal.2d 628 [220 P.2d 897], "[T]he underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements' (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818]); 'to socialize the burden . . .—to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' [citation]."

Zoning is enacted for the public benefit. The need for "resolute sophistication in the face of occasional insistence that compensation payments must be limited lest society find itself unable to afford beneficial plans and improvements," was aptly stated by Professor Michelman in his well-noted law review article:[2] "What society cannot, indeed, afford is to impoverish itself. It cannot afford to instigate measures whose costs, including costs which remain 'unsocialized,' exceed their benefits. Thus, it would appear that any measure which society cannot afford or, putting it another way, is unwilling to finance under conditions of full compensation, society cannot afford at all."

Not all governmental downzoning must be compensated. However, the compensatory "or damaged" provision of the California Constitution should apply when by public action land has (1) suffered substantial decrease in value, (2) the decrease is of long or potentially infinite duration and (3) the owner would incur more than his fair share of the financial burden.

Applying this fairness test to the instant factual situation, plaintiffs have stated a valid cause of action in inverse condemnation. The 80 percent decrease in value of plaintiffs' property—from a market value of $400,000 to $75,000—is obviously substantial. Because the action is taken pursuant to Government Code section 65300, this decrease clearly is of long duration.[3] Of the four quadrants of the subject intersection, three are zoned for commercial use and *only* plaintiffs' quadrant has been rezoned to "low-density single family residential." Plaintiffs therefore are being forced to shoulder a burden that surrounding landowners have not been made to share.[4]

---

[2]Michelman, *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165, 1181.

[3]Section 65300 of the Government Code states: "Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, *long-term general plan* for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation·to its planning." (Italics added.)

[4]The facts of this case do not present a situation where the property was upzoned and then subsequently downzoned while in the hands of the same owner.

Applying the tripartite test of fairness to downzoning should not impose an undue burden on governmental agencies. Once the landowner establishes his cause of action for damage, the condemning agency has several alternatives including: (1) compensating the landowner for the decrease in value; (2) paying total value for the land and acquiring title; (3) rescinding the downzoning, in which case the agency would be abandoning a condemnation, becoming liable to the landowner for interim damage, costs and attorney's fees. (Cf. Code Civ. Proc., § 1255a; *City of Los Angeles* v. *Ricards* (1973) 10 Cal.3d 385 [110 Cal.Rptr. 489, 515 P.2d 585].) The first two alternatives assume the validity of the zoning ordinance and therefore are inapplicable when the ordinance itself is invalid.[5] In the case of an invalid ordinance, the court in issuing mandate should follow the third alternative, awarding interim damage, costs and attorney's fees.[6]

Plaintiffs have stated a cause of action in inverse condemnation. Therefore, it was error for the trial court to sustain the demurrer without leave to amend. Accordingly I would grant the writ directing the trial court to overrule the demurrer.

The application of petitioner Von's Grocery Co. for a rehearing was denied December 24, 1975, and the opinion was modified to read as printed above. Clark, J., was of the opinion that the application should be granted.

---

[5] Whether the present zoning classification of the property is valid has not yet been decided by the trial court or by this court, as that issue is not before us. However, previous California cases have held that land use regulation creating an island of residential use surrounded by less restrictively zoned property constituted an invalid exercise of the legislative power. (*Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776 [31 Cal.Rptr. 335, 382 P.2d 375]; *Reynolds* v. *Barrett* (1938) 12 Cal.2d 244 [83 P.2d 29].)

[6] Government Code section 818.2 providing that a public entity is not liable for injury caused by the enactment of a law is inapplicable when the governmental action rises to the level of a taking or damaging within the eminent domain provisions of the Constitution.