Lawrence E. FUREY, Trustee, Plaintiff,

v.

CITY OF SACRAMENTO, et al., Defendants.

No. CIV.S–74–571 RAR.

United States District Court, E.D. California.

Aug. 3, 1984.

Arne D. Wagner, Steven Brockhage, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for plaintiff.

Henry W. Crowle, Memering & DeMers, L.E. Elam, County Counsel, Sacramento County, James P. Jackson, Leliand J. Savage, Sacramento, Cal., for defendants.

## MEMORANDUM AND ORDER

RAMIREZ, District Judge.

The question presented by the instant litigation is this: is a landowner who improves his property solely on his own initia-tive and in the expectation of realizing a substantial profit entitled to the restitution of the cost of the improvements when the local zoning authority declines to rezone the property in a manner necessary to real-ize that profit?

## FACTUAL AND PROCEDURAL BACK-GROUND

The plaintiff, as trustee,[1] is the legal owner of certain real property located with-in the limits of the City of Sacramento.[2] The real property in question is now and at all relevant times has been zoned and used for agricultural purposes.

In the late 1950s and the early 1960s both the plaintiff and the defendants confi-dently expected the plaintiff's land to be transformed from agricultural uses to resi-dential and commercial uses within a fore-seeable period of time. This expectation is reflected in the numerous planning docu-ments published by the defendants roughly contemporaneously with the events describ-ed herein. Because the conversion of the land from agricultural uses to residential and commercial uses would have required the installation of sewers, proceedings were instituted by the landowners pursu-ant to the Improvement Act of 1911, Cal. Sts. & Hy.Code §§ 5000, et seq. As a di-rect result of these proceedings, the Nato-mas Sewer Assessment District was formed, sewers were installed on the plain-tiff's land, and the costs of the sewers were calculated and assessed against the plaintiff's land on a pro rata basis. Bonds secured by the plaintiff's land were issued, sold, and ultimately redeemed by the plain-tiff by periodic payments of the assess-ments plus interest. To date, the plaintiff has paid approximately $826,447.00 in prin-cipal and interest for the installation of sewers on his land. Although the project was completed in 1965, the plaintiff has

---

**1.** The plaintiff or a predecessor trustee has been the legal owner of the real property at all rele-vant times. The change in the identity of the trustee from time to time is of no significance, and the Court uses the word "plaintiff" herein to mean either the present office holder or his predecessor.

**2.** At the time of most of the events discussed *infra,* the property was within the unincorporat-ed area of the County of Sacramento. The plaintiff's property was incorporated into the City in 1962.

never applied for a rezoning of his property to permit more intensive uses.[3]

In 1970, the State of California enacted the Open Space Lands Act, Cal. Gov't. Code §§ 65560, *et seq.*, which *required* every city and county in the State of California to adopt a "local open-space plan."[4] In 1973, to comply with California Government Code § 65563, the City of Sacramento amended its general plan and zoning ordinances to include an "open-space element." In particular, certain portions of the city, including the plaintiff's land which was then being and had always been used for agricultural purposes, were designated "Open Space Reserve." Under this designation, the plaintiff could continue to use his land for agricultural, or other consistent, purposes but was precluded from using the land for residential or commercial purposes. This designation of the plaintiff's land as "Open Space Reserve" effected *no* change in the zoning of the plaintiff's property.

The City's designation of the plaintiff's land as part of the City's "Open Space Reserve" frustrated the plaintiff's inchoate plans to subdivide and develop his property for residential and commercial uses and rendered his investment in sewers essentially worthless. In response, plaintiff brought suit against the City and the County in both state and federal courts alleging, *inter alia,* that by designating his land as "Open Space Reserve" the defendants had inversely condemned his land, for which he was entitled to just compensation, and had deprived him of his investment in sewers, for which he was entitled to reimbursement.[5] By Order of October 9, 1974, this Court decided to abstain in favor of the state court but to retain jurisdiction over the federal constitutional claims for adjudication, if necessary, after adjudication of the state law issues. *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ In reference to the state court action, defendants filed a demurrer to the plaintiff's complaint which was sustained by the trial court without leave to amend. On appeal, the California Supreme Court reversed and remanded the case for further proceedings. *Furey v. City of Sacramento,* 24 Cal.3d 862, 157 Cal.Rptr. 684, 598 P.2d 844 (1979). In reversing the lower court, the California Supreme Court held that insofar as the plaintiff contended that a designation of his property as "Open Space Reserve" was a taking of that property, the plaintiff had not stated a claim upon which relief could be granted. The law in California is that unless a particular type of zoning deprives the landowner of

---

**3.** The parties have stipulated that after June 1973 an application for a rezoning would have been a vain act. Stipulation No. 23, Stipulations filed September 20, 1982. Nevertheless, for approximately eight years, the plaintiff made no attempt to capitalize on his investment, no doubt for sound business reasons.

**4.** Section 65563 of the California Government Code provides in relevant part as follows:

On or before December 31, 1973, every city and county shall prepare, adopt, and submit to the Secretary of the Resources Agency a local open-space plan for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction.... Section 65560(a) defines "local open-space plan" as

... the open space element of a county or city general plan adopted by the [B]oard [of Supervisors] or [City C]ouncil, either as the local open-space plan or as the interim local open-space plan adopted pursuant to Section 65563.

"Open-space land" is defined in § 65560(b) as:
... any parcel or area of land or water which is essentially unimproved and devoted to an open-space use as defined in this section and which is designated on a local, regional, or state open-space plan as any of the following:

. . . . .

(2) Open space used for the managed production of resources, including, but not limited to, forest lands, rangeland, agricultural lands, and areas of economic importance for the production of goods and fiber ....

**5.** Various sanitation districts were also named as defendants in both actions. In the federal action the plaintiff complains additionally that the districts have entered into a contract with the Environmental Protection Agency whereby the EPA granted the districts large sums to build a wastewater treatment facility in exchange for a promise by the districts that they would not permit hookups into the system from the plaintiff's land.

substantially all of the reasonable use of the land, there is no taking. Designating land which has always been, is currently being used, and may continue to be used for agricultural purposes as "Open Space Reserve" is not a taking since the landowner clearly has a reasonable ongoing use of the property. The Court also held that insofar as the plaintiff contended that the inclusion of his property in "Open Space Reserve" was a taking of the sewers which the plaintiff alleged had been installed upon the initiative of the defendants, the plaintiff had stated a claim. The defendants, having induced the plaintiff to expend large sums for the installation of sewers on his property, could not thereafter zone the land so as to preclude the plaintiff from recouping his investment.[6] Because the decision of the California Supreme Court was made upon the review of the sustaining of a demurrer, where all the allegations of the complaint are assumed to be true, the Supreme Court remanded the action to the Superior Court for further proceedings.

Since remand to the Superior Court, the plaintiff has not actively litigated his action in that forum. Instead the plaintiff has reactivated his action in federal court, and the parties appear to be agreed that the difficult issues of state law which had warranted abstention by this Court have been resolved.

In July 1982 the parties, having stipulated that there were no material issues of fact in dispute, brought on cross-motions for partial summary judgment. By their motions the parties asked this Court to determine the limited issue of who instigated the proceedings which culminated in the formation of the Natomas Sewer Assessment District. The parties perceived this issue as significant because of the decision of the California Supreme Court that the

plaintiff was entitled to reimbursement of his assessments or permission to develop his property for residential uses *if and only if he could prove his allegations that it was the City or the County who initiated and promoted the installation of sewers.* *Furey v. City of Sacramento,* 24 Cal.3d at 875, n. 8, 157 Cal.Rptr. 684, 598 P.2d 844 *(dicta).* In response to their respective motions, this Court determined that the Natomas Sewer Assessment District was formed solely on the initiative of the landowners in the area to be assessed and that neither the City nor the County in any way induced or promoted the formation of the district. Relevant portions of the Court's written disposition of these motions is attached herein as Appendix A. That question having been resolved, the parties brought on the instant motions for summary judgment.

DISCUSSION

The gravamen of the plaintiff's action is that his property has been inversely condemned by the City's inclusion of his property in its "Open Space Reserve." *See generally United States v. Clarke,* 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980). In this regard, plaintiff makes two, alternative, contentions: the City's designation of his property as part of its "Open Space Reserve" constitutes a taking of his entire property without just compensation, or that the City's designation of his property as "Open Space Reserve" constitutes a taking of his investment in the sewers. These contentions will be discussed separately.

A

The United States Supreme Court has repeatedly observed that the concept of a "taking" defies ready definition. *Ruckelshaus v. Monsanto Co.,* — U.S. —, —

---

**6.** The California Supreme Court also held that the plaintiff was not entitled to recover damages for the taking of his sewers. The Court held that the City could remedy the wrong suffered by the plaintiff in one of two ways at its sole election: either the City could permit the plaintiff to use his land for residential purposes or the City could reimburse him for his investment

in sewers. *See Agins v. City of Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). *Cf., San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 653–60, 101 S.Ct. 1287, 1304–08, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).

— ——, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 174–75, 100 S.Ct. 383, 389–90, 62 L.Ed.2d 332 (1979); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978). *See also Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 82–83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Andrus v. Allard*, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979). The point at which a governmental regulation "goes too far" and thus constitutes a taking, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), can only be identified in the context of an "ad hoc, factual inquiry." *Ruckelshaus v. Monsanto Co.*, — U.S. at ——, 104 S.Ct. at 2874; *Hodel v. Virginia Surface Mining & Reclamation Association*, 452 U.S. 264, 294–95, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981); *Kaiser Aetna v. United States*, 444 U.S. at 175, 100 S.Ct. at 390; *Penn Central Transportation Co. v. City of New York*, 438 U.S. at 124, 98 S.Ct. at 2659. This Court takes as its touchstone, however, the observation of the Court in *Agins v. City of Tiburon:*

> The application of a general zoning law to a particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed.2d 842 (1928), or denies an owner economically viable use of his land, see *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138, n. 36, 98 S.Ct. 2646, 2666, 57 L.Ed.2d 631 (1978).

447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The Court's analysis of the facts will focus, therefore, on two considerations: does California's Open Space Lands Act substantially advance legitimate state interests, or does the plain-

tiff retain an economically viable use of his land?

■ There can be no doubt that the conservation and preservation of open space lands substantially advances legitimate state interests. Indeed, the United States Supreme Court has held that a state's desire to protect its citizenry from the "ill effects of urbanization" is an appropriate one. *Agins v. City of Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2142. *See also Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The plaintiff has not suggested that the method of conserving and preserving open space lands adopted by the state is irrational or unlikely to further the state's goals. Furthermore the Court has searched the plaintiff's moving papers in vain for an assertion that the inclusion of the plaintiff's land in "Open Space Reserve" has deprived him of all economically viable use of the property. In fact, the parties have stipulated that at the time the property was purchased it was being used for farming, and that those portions that have remained in the plaintiff's possession are still being used for that purpose. Stipulation No. 30, Stipulations filed September 20, 1982.[7] Additionally, the parties have submitted a spread sheet for the property from the period 1959 to 1981, which indicates that, with the exception of 1966, the farming operations have generated a profit. Exhibit "V". Since the plaintiff does not assert that the City's goals were inappropriate or that the City's methods were irrational and since plaintiff does not suggest that the City's acts deprived him of all economically viable use of the property, it would appear that the plaintiff has failed utterly to demonstrate a taking of his property.

The plaintiff does not base his contention that a taking has occurred on the formulation of the Court in *Agins v. City of Tiburon*, however. Relying on *Penn Central Transportation Co. v. City of New York*, the plaintiff contends that a taking occurs

---

7. Hereinafter, unless specifically noted, all references to stipulations of the parties are to the

Stipulations filed September 20, 1982.

whenever the acts of the local zoning authority cause a diminution in the value of the property and upset investment-backed expectations. The plaintiff argues that both of these considerations are pertinent to the facts in the instant case, and that he is therefore entitled to be paid the full fair market value of his property.[8]

The concept "diminution in value" clearly invites one to compare the fair market value of the property immediately before the enactment of the challenged regulation with the fair market value of the property immediately thereafter. The parties have stipulated that in 1970 the plaintiff sold the property to Lear Siegler Properties, Inc., the purchase price being $515,700.00 in cash and a note in the amount of $1,659,300.00. Stipulation No. 19. The total purchase price approximates $1,890.00 per acre. The parties have further stipulated that after the City's amendment of its general plan and its enactment of implementing zoning ordinances, the fair market value of the property was between $600.00 and $800.00 per acre. Stipulation No. 21. The parties have also stipulated that in December 1973 Lear Siegler Properties, Inc., having decided the property was not worth the amount owing on the note, reconveyed the property to the plaintiff in lieu of foreclosure. Stipulation No. 22. On the basis of these facts, the Court concludes that the City's acts did cause a diminution in the value of the plaintiff's property.

In arguing that the City's conduct upset his investment-backed expectations, the plaintiff does not suggest that the mere purchase of the property, without more, constitutes the sort of investment protected by the law, even if the purchase were made with the expectation that the property could be developed and even if that expectation were based on sound business judgment. Such a contention would be contrary to existing federal and state law and would be tantamount to arguing for a vested right to develop if consistent with sound business judgment.

The United States Supreme Court has repeatedly held that the property rights protected by the Takings Clause are those property rights created by state law. *Ruckelshaus v. Monsanto Co.*, —— U.S. at ——, 104 S.Ct. at 2872; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). California law on the question has long been clear: no property owner has a vested right in a particular type of zoning, existing or anticipated. *HFH, Ltd. v. Superior Court*, 15 Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237 (1975); *Morse v. County of San Luis Obispo*, 247 Cal.App.2d 600, 55 Cal.Rptr. 710 (1967); *Anderson v. City Council*, 229 Cal.App.2d 79, 40 Cal.Rptr. 41 (1964); *Price v. Schwafel*, 92 Cal.App.2d 77, 206 P.2d 683 (1949); *O'Rourke v. Teeters*, 63 Cal.App.2d 349, 146 P.2d 983 (1944). Clearly, then, the investment in land expressed as its purchase price cannot give rise to investment-backed expectations protected by the law.

The plaintiff's argument that he has investment-backed expectations entitled to the law's protection is premised instead on the fact of the installation of the sewers. Not only did the plaintiff acquire the property, but he also spent in excess of three-quarters of a million dollars preparing for intensive development of the property. His expectation of intensive development was based not only on his own judgment about the probable growth of the City, but also on similar judgments by the City and County.[9] The plaintiff argues that it is this additional investment that makes the City's

---

**8.** The Court notes that *Penn Central* predates *Agins*, and for this reason, is inclined to find that the *Agins* formulation, if not a restatement of the test in *Penn Central*, is at least a gloss upon or a refinement of the test in *Penn Central*.

**9.** The plans adopted by both the City and the County which evidence their expectations concerning the extent and direction of urban growth were adopted in 1962, well after the process for the installation of sewers had commenced. Those documents, however, make it plain that they were the product of a lengthy study process, including public debate, occurring at about the same time the Natomas Sewer Assessment District was formed.

designation of his property as "Open Space Reserve" a taking.

■ In order for an expectation to be entitled to the law's protection, it must be more than simply "investment-backed;" it must be *reasonable.* Reasonable, in this context, means at least consistent with the law in force at the time of the formation of the expectation. *Ruckelshaus v. Monsanto Co.,* —— U.S. at —— – ——, 104 S.Ct. at 2875. The reasonableness of the plaintiff's expectations of development thus depends on the extent to which California law fostered and protected that expectation.

■ Consistency between the plaintiff's expectations and the general plans is not sufficient to make the plaintiff's expectations reasonable. As noted above, it has long been settled law in California that a landowner has no vested right in a particular zoning classification. *HFH, Ltd. v. Superior Court,* 15 Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237; *Morse v. County of San Luis Obispo,* 247 Cal.App.2d 600, 55 Cal. Rptr. 710; *Anderson v. City Council,* 229 Cal.App.2d 79, 40 Cal.Rptr. 41; *Price v. Schwafel,* 92 Cal.App.2d 77, 206 P.2d 683; *O'Rourke v. Teeters,* 63 Cal.App.2d 349, 146 P.2d 983. Since a general plan is "by its very nature tentative and subject to change," *Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 118, 109 Cal. Rptr. 799, 514 P.2d 111 (1973), and since the adoption of a general plan precedes the enactment of the zoning ordinances designed to implement the plan, it follows *a fortiori* that a landowner may not obtain a vested right in the particular provisions of a general plan. *See Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111 (the adoption of a general plan that showed street extensions over portions of the plaintiff's property did not effect a taking of such property). The plaintiff herein was not entitled to rely, to his detriment or otherwise, on the general plans adopted by the City and the County. Any expectation that he would be able to develop his property in accordance with those plans was not reasonable and not protected by the Takings Clause.

To the extent that the plaintiff's expectations were based on his own business judgment, they are not entitled to the protection of the law either. In this regard the plaintiff's position differs in degree, but not in kind, from the individual who merely purchases the property with the hopes of developing it at sometime in the future. A property owner cannot, by voluntarily preparing his property for intensive development, circumscribe the City's power and authority to legislate in the public interest.

This Court concludes that the plaintiff had no legally cognizable basis for the formation of the expectation that he would be permitted to change the uses to which his property could be devoted, and that any such expectation, investment-backed or otherwise, was unreasonable. Accordingly, the Court concludes that the City's acts did not constitute a taking.

■ Assuming *arguendo* that the plaintiff did have frustrated but reasonable investment-backed expectations, it does not follow *ipso facto* that the City has committed a constitutional tort. The economic impact of a regulation and the frustration of reasonable investment-backed expectations are, of course, "relevant considerations" in determining whether a taking has occurred, *Penn Central Transportation Co. v. City of New York,* 438 U.S. at 124, 98 S.Ct. at 2659, but they are not determinative. *Cf., Loretto v. Teleprompter Manhattan CATV Corp.,* 102 S.Ct. at 3171. The ultimate question is whether it is consistent with justice and fairness to force a landowner rather than the public to bear the burdens occasioned by governmental regulations. *Pruneyard Shopping Center v. Robins,* 447 U.S. at 83, 100 S.Ct. at 2041; *Kaiser Aetna v. United States,* 444 U.S. at 175, 100 S.Ct. at 390; *Penn Central Transportation Co. v. City of New York,* 438 U.S. at 125, 98 S.Ct. at 2659. This, in turn, requires a weighing of the public and private interests implicated by both the governmental regulation and the finding of a

taking. *Agins v. City of Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141.

To the extent that the private interest is in the maximum exploitation of a piece of property, it is entitled to no weight whatsoever. *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210; *Nasser v. City of Homewood*, 671 F.2d 432 (11th Cir.1982); *Deltona Corp. v. United States*, 657 F.2d 1184 (Ct.Cl.1981); *William C. Haas & Co. v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir.1979). Rather the private interest protected by the law is the interest in retaining some economically viable use of the land. *Penn Central Transportation Co. v. City of New York*, 438 U.S. at 130, 98 S.Ct. at 2662. As noted above, the regulation challenged herein did not have the effect of depriving the plaintiff of *all* economically viable use of his land.

The public's interest in the City's open space zoning is its interest in the preservation and conservation of valuable, and disappearing, open space land. *See generally*, Geier, Karl E., "Agricultural Districts and Zoning: A State-Local Approach to a National Problem," 8 Ecology L.Q. 655 (1980). Such an interest is not only legitimate but also substantial. *Agins v. City of Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141.[10] The public's interest in zoning generally is its interest in assuring that the community is "beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled," *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). This interest, too, is not only legitimate but substantial. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The plaintiff here receives in some measure the benefits that accrue to all who own property in a well-planned community, and those benefits must also be included in the calculus.

In balancing the equities the Court must consider the role that the plaintiff voluntarily assumed. In the present case, the plaintiff is not a small family farmer deprived of his livelihood by the unconscionable actions of governmental entities. Since 1959, the land has been farmed for the plaintiff by tenant farmers. Stipulation No. 30. As the record in this action makes abundantly clear, the plaintiff's predecessor acquired the property knowing it was then zoned for agriculture but fully intending to devote it to more intensive uses at the most opportune time. *See generally* M. Clawson, *Suburban Land Conversion in the United States: An Economic and Governmental Process* (1971).

It has long been conclusively demonstrated that zoning has an impact on the price of land. D. Hagman & D. Misczynski, *Windfalls for Wipeouts: Land Value Capture and Compensation*, 75–111 (1978). This is inevitable since the price of land necessarily reflects "expected future earnings discounted by some measure of uncertainty." Libby, Lawrence W., "Land Use Policy: Implications for Commercial Agriculture," 56 *Am. J. Agricultural Economics*, 1143 (1974). Since "few land uses return *less* per unit of land than agriculture and other open land uses," *id.*, it is inevitable that agricultural zoning will depress the price of the land. By the same token, a rezoning of the property to a more intensive use can dramatically increase the value of the land. D. Hagman & D. Misczynski, *supra;* M. Clawson, *supra* ("[L]and developers who benefit from rezoning do not wait patiently for plums to fall into their open mouths but vigorously shake the tree.")

The plaintiff herein chose to play what has been called "the zoning game." The price his predecessor paid for the land in 1959, while undoubtedly reflecting the par-

---

**10.** There is a substantial literature on the problem of disappearing farmland, so substantial as to make impossible even the most superficial collection of studies. *See generally* Dresslar, John A., "Agricultural Land Preservation in California: Time for a New View," 8 *Ecology L.Q.*,

303 (1979) and the references contained therein. The literature on urban sprawl dates from at least 1957. Gregor, Howard F., "Urban Pressures on California Land," 33 *Land Economics* 311 (1957).

ties' relative judgments about the potential for rezoning, was determined in part by the County's exercise of the police power in a manner advantageous to the plaintiff. The plaintiff's predecessor purchased the property in hopes of realizing a substantial increase in the value of the property by the simple expedient of obtaining a favorable exercise of the City's rezoning authority. All the City did, by designating the plaintiff's land as "Open Space Reserve," was indicate that such a rezoning would not be forthcoming. The plaintiff, having taken advantage of the City and County's zoning power in acquiring the land, is hardly entitled to complain that the City's denial of a rezoning has caused him a constitutionally cognizable injury.

Finally, in evaluating the facts before the Court in light of the demands of fairness and justice, the Court cannot ignore the fiscal realities presented by the stipulations of the parties. The plaintiff purchased 1157 acres of agricultural land in 1959 for $772,789.60. Between 1965 and 1973, the plaintiff spent $826,449.29 on account of the assessments. Plaintiff's total capital investment in the property has been $1,599,238.89. The plaintiff's return, exclusive of the annual profit on the farming operations, has been $4,518,103.00, calculated as follows: $515,700.00 cash payment of Lear Siegler Properties, Inc., which the plaintiff retained when Lear reconveyed the property to the plaintiff; $12,403.00, which the City paid when it purchased seven acres of the plaintiff's land in 1967; $4,000,000.00, which a buyer paid for the southernmost 220 acres of the property in 1981. In sum, the plaintiff has received almost a 200 percent return on his investment, in addition to farming profits, while at the same time retaining 930 profitable acres.

On balance the Court concludes that it is consonant with justice and fairness to require the plaintiff to shoulder the burden of the City's amendment to its general plan and enactment of the implementing zoning regulations. The City's acts have furthered substantial state and local goals while the plaintiff has more than recovered

his investment in the property, and made economically viable use thereof. Although the Court has previously concluded that the City's acts did not constitute a taking because the acts in no way frustrated any reasonable expectation of the plaintiff's, were the Court to find otherwise, it would still conclude that no taking had occurred by reason of the City's inclusion of the plaintiff's property in "Open Space Reserve."

B

The plaintiff argues in the alternative that, even if his property considered as a whole has not been taken, his sewers have been. The plaintiff makes the very straightforward argument that the only value of the sewers is in access to them; that the City's designation of his property as "Open Space Reserve" and the County Regional Sanitation District's contract with the Environmental Protection Agency effectively deprives him of access to the sewers on his property; and that for all intents and purposes the sewers have been taken just as much as if they had been removed and destroyed. The plaintiff points out that there is no residual economically viable use for the sewers.

■ The simple response to plaintiff's argument in this regard is that a property owner challenging a zoning ordinance may not subdivide the components of his property into distinct units in order to argue that one component has been wholly taken.

"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole....

*Penn Central Transportation Co. v. City of New York*, 438 U.S. at 130, 98 S.Ct. at 2662 (rejecting the contention that a taking occurred because the New York City his-

toric preservation ordinance took the plaintiff's "airspace rights"). *See also American Savings & Loan Association v. County of Marin,* 653 F.2d 364 (9th Cir.1981). Improvements to property are as much a part of the property as the mineral interests or the airspace interests. Cal.Civ. Code §§ 658 and 660. Thus the fact that a particular improvement to the property has been rendered essentially worthless to the property owner does not dictate a different analysis. *See Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

■ All of the cases cited by the plaintiff in support of his argument that his sewers, or his assessments therefor, have been taken involve assessment proceedings. *Georgia Railway & Electric Co. v. City of Decatur,* 297 U.S. 620, 56 S.Ct. 606, 80 L.Ed. 925 (1936); *Gast Realty & Investment Co. v. Schneider Granite Co.,* 240 U.S. 55, 36 S.Ct. 254, 60 L.Ed. 523 (1916); *Myles Salt Co. v. Board of Commissioners,* 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916); *Village of Norwood v. Baker,* 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898). Although decided in a variety of factual settings, these cases uniformly stand for the unexceptional proposition that a local government cannot, consistent with the Takings Clause, require a particular segment of the community to bear the costs of civic improvements unless the segment so burdened is specially benefited by the improvement and there is a rational relationship between the benefits conferred and the costs imposed. The Court finds these cases wholly inapposite. The plaintiff is not contending that the original assessment proceedings were in any way defective, that his land was not specially benefited by the sewers at the time of the formation of the Natomas Sewer Assessment District or at the time of allocating the costs of the sewers among the landowners in the district, or that there was no rational relationship, in 1965, between the assessment and the benefit. Stripped to its essentials, the plaintiff's argument is that once a local government consents to the formation of a special assessment district it cannot thereafter exercise its police power in a manner

which deprives the landowners of the special benefits originally conferred. The cases cited by the plaintiff simply do not address that proposition.

The California Supreme Court, in addressing this question, held that if the special assessment district had been formed and the assessment imposed as a result of the importunings of the City or County, then it would be appropriate to limit the City or County's authority to exercise the police power in a manner inconsistent with its earlier position, on which the landowners had relied to their detriment. *Furey v. City of Sacramento,* 24 Cal.3d at 874–76, 157 Cal.Rptr. 684, 598 P.2d 844. The Court also indicated that if the special assessment district had been formed voluntarily by the landowners, then they could not complain. *Id.* at 875, n. 8, 157 Cal.Rptr. 684, 598 P.2d 844. This Court has previously found that the Natomas Sewer Assessment District was formed wholly on the initiative of the affected landowners and that the role of the County was simply one of accommodation. Appendix A.

■ Based on the foregoing, this Court is persuaded that the distinction made by the California Supreme Court is a rational and appropriate one. The plaintiff is arguing, in essence, that the local governments, having acquiesced in the installation of sewers, are now estopped to exercise their police powers in a manner which frustrates the use of the sewers, unless of course the local governments undertake reimbursement in full. While estoppel may be invoked against a governmental entity in the proper circumstances, this Court is satisfied that the proper circumstances are few and far between. *See Shamrock Development Co. v. City of Concord,* 656 F.2d 1380 (9th Cir.1981). In any event, the proper circumstances do not exist in the instant case.

One of the essential elements of estoppel is that the party to be estopped must have intended or implicitly invited the other party to rely on a representation. *Id.* at 1386; *Parsons v. County of Del Norte,* 728 F.2d

1234 (9th Cir.1984). Merely by acquiescing in the formation of a special assessment district, the County did not promise the landowners that the property would be rezoned to make the sewers useful. The plaintiff's expectation that such rezoning would be forthcoming cannot provide the basis for an estoppel.[11] The unilateral act of the plaintiff in installing sewers on his property cannot, either on the basis of the Takings Clause or on the basis of an equitable estoppel, limit the manner in which the City exercises its police power. The Court therefore concludes that the City's designation of the plaintiff's land as "Open Space Reserve" did not effect a taking.

### C

The plaintiff alleges, in the third and fourth claims of his complaint, that the Sacramento Regional Sanitation District ("District") took his investment in sewers by entering into a contract with the Environmental Protection Agency which provided, in essence, the following: in exchange for a grant of One Million, Six Hundred Twenty Thousand, Seven Hundred and Fifty Dollars ($1,620,750.00) with which to construct a new waste-water disposal facility, the District covenants not to permit new sewer hookups from, *inter alia*, the plaintiff's property for a period of twenty years; additionally, the contract provides that if the District does permit new sewer hookups from the plaintiff's property, the District would have to return all of the funds granted plus interests. The plaintiff seeks either damages in the amount of the assessments paid plus interest or a declaration that the contract between the District and the Environmental Protection Agency is unlawful insofar as it forbids new sewer hookups from the plaintiff's property.

Despite the fact that it was understood and agreed among the parties, and ordered by the Court, Order of October 14, 1982, pg. 2, lines 1–7, that the cross-motions for summary judgment would be "dispositive of all liability issues," the plaintiff has not proffered any argument with respect to his claim against the District. The only inference to be drawn from this silence is that the plaintiff believes that the Court's disposition of his claims against the City and County would be conclusive on his claims against the District. With such a conclusion, the Court is in full agreement. The analysis of the legality of the District's contract with the Environmental Protection Agency is not different because the result was accomplished by contract rather than by ordinance.

■ For the reasons fully explicated above, the Court concludes that the contract between the District and the Environmental Protection Agency was lawful and did not effect a taking of the plaintiff's property. Accordingly, the Court will grant summary judgment for the District.

For the reasons set forth above, and good cause appearing therefor,

IT IS HEREBY ORDERED that the motions of the defendants, and each of them, for summary judgment be, and the same hereby are, granted, and

IT IS FURTHER ORDERED that the motion of the plaintiff for summary judgment be, and the same hereby is, denied, and

IT IS FURTHER ORDERED that the Clerk of the Court enter a final judgment in accordance with Federal Rule of Civil Procedure 58 forthwith, in favor of the defendants and against the plaintiff.

IT IS SO ORDERED.

### APPENDIX A

The cross-motions for partial summary judgment came on regularly for hearing before the undersigned on July 6, 1982. Arne Wagner, Esq. and Steven Brockhage, Esq., appeared on behalf of plaintiff, LAWRENCE E. FUREY. Leiland J. Savage,

---

**11.** As the California Supreme Court pointed out, the situation would be quite. otherwise if the County or City had instigated and urged the formation of the special assessment district; by showing the initiative the City or County would have been promising, implicitly, that it would exercise its police power to protect the landowners' investment.

Deputy City Attorney, appeared on behalf of defendant, CITY OF SACRAMENTO; Henry W. Crowle, Esq., appeared on behalf of defendant, COUNTY OF SACRAMENTO; and Robert L. Pleines, Deputy County Counsel, appeared on behalf of defendant, SACRAMENTO REGIONAL COUNTY SANITATION DISTRICT. Having considered the various documents in the file and the respective arguments of counsel, the Court now renders the following decision.

Because these motions involve issues which may have important consequences for the parties, and because the Court's disposition cannot be understood without a thorough understanding of the statutory framework, this memorandum will address the statutory material at some length.

ISSUE

By their cross-motions for partial summary judgment, the parties have asked this Court to determine who instigated the proceedings which culminated in the formation of the Natomas Sewer Assessment District. The parties perceive this question as critical to the liability of the defendants because of the observation made by the California Supreme Court in the course of its decision:

> [W]e believe that in circumstances such as those here alleged, wherein both the undertaking of the public improvement and the action foreclosing any realistic access to the special benefits generated by it having resulted *from government initiative*,[8] a present reexamination of the relationship between assessment and benefit is constitutionally required.
>
> fn. 8: *To be distinguished* in this respect are cases in which the construction of the public improvement is undertaken *on the initiative of the property owner himself.* (See, e.g., Wat. Code, §§ 30200, *et seq.*, 34150, *et seq.*) *In such a situation,* barring strong evidence of government inducement or promotion, *the property owner* stands in the position of a volunteer, who in the event of intervening regulations barring the use of the improvement in

the public interest, *cannot be heard to complain of the loss of his investment.* (See and cf., *Avco Community Developers, Inc. v. South Coast Regional Com.,* (1976) 17 Cal.3d 785, 789–790). (Emphasis added)

Since the California Supreme Court was reviewing the grant of a demurrer, it assumed the truth of the plaintiff's allegation that the formation of the Natomas Sewer Assessment District was at the instigation of the defendants. Both parties have now requested this Court to determine the accuracy of that assumption.

THE STATUTES

The formation of the Natomas Sewer Assessment District proceeded in accordance with the Improvement Act of 1911, *see generally, The Improvement Act of 1911–12–15: Hearings before the Assembly Interim Committee on Municipal and County Government,* June 18–19, 1962 (Testimony of Messrs. Richard Milbrodt and Ward Moul) and the Special Assessment Investigation, Limitation, and Majority Protest Act of 1931, Cal.Sts. & Hy.Code, §§ 2800, *et seq.* The conduct of the parties, therefore, with respect to the formation of the Natomas Sewer Assessment District must be understood in the context of those Acts.

The construction of sewers is authorized by the Improvement Act of 1911, § 5101. The Act provides for the adoption, by the legislative body creating the special assessment district, of a Resolution of Intention, §§ 5131 and 5132. The Act provides for notice of the adoption of the Resolution of Intention to all individuals whose property may be assessed, § 5132, and for a hearing upon the protests of any such persons, § 5221. In the event that less than a majority of the landowners in the proposed district protest the proposal and the legislative body determines that the formation of the special assessment district is appropriate, the legislative body acquires jurisdiction to proceed with the project, § 5225.

Once the legislative body acquires jurisdiction to order commencement of the project, it adopts a resolution to that effect, § 5240, and lets the contract, § 5241–5260. After the completion of the project, the engineer [1] prepares a diagram of the property to be assessed for the costs of the project, § 5340. The costs of the project include not only the amount awarded to the contractor, but also the costs of necessary acquisitions, § 5023.1, and the "incidental expenses," § 5024. "Incidental expenses" include the compensation of the appointee of the superintendent of streets,[2] § 5024(c), the costs of proceedings pursuant to the Special Assessment Investigation, Limitation, and Majority Protest Act of 1931, § 5024(f), and "any other expenses incidental to the construction, completion, and inspection of the work in the manner provided for in this [Act]," § 5024(h). After the preparation of the diagram, the superintendent of streets allocates to each of the parcels in the district that portion of the costs which reflects the extent to which each parcel is benefited by the improvement, § 5343. The assessment is then formally made, §§ 5360–5362, and notice thereof is given to the affected landowners, §§ 5362–5365. The landowners are entitled to protest to the legislative body any deficiencies in the performance of the contractor or any defects in the assessment, §§ 5366–5369. Once the legitimacy and correctness of the assessments are determined by the legislative body, § 5367, a warrant for the recovery of the costs is issued to the contractor, § 5371 and the contractor records the warrant, the diagram, and the assessment, whereupon each assessment becomes a lien upon the parcel, § 5372.

The Act also provides for the collection of the assessment from the landowners, §§ 5390–5458. As an alternative to the direct and immediate collection of the assessments from the landowner, the legislative body may choose to sell bonds, §§ 6400–6632, in which event, the contractor is paid with the proceeds of the sale of the bonds. The landowner makes periodic payments of principal and interest to the legislative body or its employee and the legislative body redeems the bonds with the funds received from the landowners. A separate bond is issued for each assessed parcel, § 6422. In the event of default, the bondholder may proceed only against the property owned by the defaulting landowner, §§ 6500, 6509 and 6510.

The Special Assessment Investigation, Limitation, and Majority Protest Act of 1931 imposes *additional* requirements on a legislative body contemplating the formation of a special assessment district, *see The Improvement Acts of 1911–13–15: Hearings before the Assembly Interim Committee on Municipal and County Government,* June 18–19, 1962 (Testimony of Ward Moul), § 2820. The Act requires the legislative body to prepare a detailed report, §§ 2824–2830, and provides for a hearing on the report, §§ 2850–2859. The Act limits the extent to which any parcel may be burdened by assessments, §§ 2900–2905. The Act permits, in most cases, a majority of the landowners of the proposed district to veto a proposal, §§ 2890–2932.

The procedures imposed by the Act have been described as "cumbersome," *Hoffman v. City of Red Bluff,* 63 Cal.2d 584, 594, 47 Cal.Rptr. 553, 407 P.2d 857 (1965); *Hearings, supra,* September 24, 1962 (Testimony of Donald C. Tillman), and there are mechanisms whereby a legislative body can avoid these requirements. *Inter alia,* the requirements of the Act may be disregarded:

when all of the owners of more than 60 percent in area of property subject to assessment for said proposed improvements have signed and filed with the

---

**1.** "Engineer" is defined by § 5013 as an employee of the legislative body, either the county surveyor, Cal. Gov't. Code § 27550, or the city engineer, Cal. Gov't. Code § 36505.

**2.** "Superintendent of streets" is defined in § 5011 as either the county surveyor or that city employee designated by the city to have responsibility for the streets.

clerk or secretary of the legislative body undertaking said proceedings a written petition for said improvements and waiver of said investigation proceedings....

§ 2804(3). Additionally, the requirements of the Act may be disregarded when the interests of public health are implicated:

None of the provisions of this division shall apply to proceedings heretofore or hereafter commenced for the construction of sanitary sewers, sewage disposal works, and storm water drains, including the acquisition of sewer and storm water drain rights-of-way and easements necessary in connection with such improvement where such proceedings have been recommended by the health officer of the city or county in which such proceedings are instituted as necessary as a health measure, if such recommendation is given in writing and spread upon the minutes of the legislative body conducting said proceedings, and such necessity is found to exist by resolution adopted by the affirmative vote of four-fifths of the members thereof. The findings and determinations made by the legislative body pursuant to this section shall be final and conclusive upon all persons in the absence of actual fraud.

§ 2808. California courts have construed § 2808, consistent with its plain language, to mean that no part of the Special Assessment Investigation, Limitation, and Majority Protest Act need be complied with if the requisite recommendation and determination have been made, *Hoffman v. City of Red Bluff, supra.*

## DISCUSSION

At the outset, the Court finds that there are no material issues of fact in dispute.

In undertaking the formation of the Natomas Sewer Assessment District, the Court notes that the initial steps were taken by three land owners in the area where the plaintiff owns land. None of the three individuals in question was the plaintiff. From the evidence, it is clear that the three land owners approached an experienced civil engineer, Loren Muir, and informed him that they would like to find a suitable method for the installation of sewers on their property. Since the formulation of a special assessment district has distinct advantages over other methods of installing pre-development improvements,[3] Muir approached various officers and employees of the County for the purpose of initiating "auxiliary" financing. Muir was undoubtedly told that the County would insist that all owners of at least 60 percent in area of the proposed district sign a petition requesting the formation of the district, in order to avoid the requirements of the Special Assessment Investigation, Limitation, and Majority Protest Act of 1931. Additionally, Mr. Muir was informed that the County would not approve the formation of a sewer assessment district of less than 2500 acres.

In response to the governmental representations, Muir prepared and distributed to the land-owners of the Natomas area a petition requesting that the Natomas Sewer Assessment District be formed and waiving the benefits of the Special Assessment Investigation, Limitation, and Majority Protest Act. One such petition was signed and returned to Muir by the plaintiff's predecessor trustee. Eventually all of the owners of at least 60 percent in area of an area in excess of 2500 acres signed and returned the petitions to Muir who

---

3. Increasingly, land developers are availing themselves of the so-called "auxiliary" financing devices to provide public utilities, streets, and other public improvements for their subdivisions. The advantage of these auxiliary devices is that construction money is obtained through essentially public procedures and thus no commitment is required of a developer's own capital or credit. Most commonly, special assessment procedures are used or independent special districts are created to finance the above-mentioned improvements. "Uses of Special Assessment Procedures and Independent Special Districts to Aid Land Development," *Final Report of the Assembly Interim Committee on Municipal and County Government,* December 1962.

thereafter submitted the petitions to the County for further proceedings.

At this point in time, a question as to the sufficiency of the petitions was raised. The bond counsel for the proposed district queried whether a petition-per-parcel, as submitted by Muir, was acceptable, or whether a single petition signed by all the landowners in the area was necessary. To avoid the administrative burdens and costs of recirculating the petitions (costs which would ultimately be borne by the landowners, § 5024(f)) without jeopardizing the legitimacy of the district or the marketability of the bonds, it was decided to avoid the requirements of the Special Assessment Investigation, Limitation, and Majority Protest Act by the use of the exception provided by § 2808. Accordingly, County Health Officers inspected the area twice, determined that the installation of sewers was a necessary health measure, and recommended that the County make the appropriate finding. The County caused the recommendations of its Health Officers to be spread upon the minutes of its meeting, and determined that the installation of sewers was necessary as a health measure.[4]

The parties are agreed that once the above-described events occurred, all subsequent proceedings were precisely as contemplated by the Improvement Act of 1911. No protests to the proposal were filed with the clerk or heard, §§ 5220 and 5221. The City of Sacramento consented to the formation of the district, §§ 5117 and 5118.

With these facts as background, the Court finds as a matter of law that the activities of the County and the City do not constitute initiation, promotion, or inducement of the formation of the Natomas Sewer Assessment District. All of the acts of the County upon which the plaintiff relies admit of only one inference, and that inference is County complaisance.

The plaintiff places special weight on four of the above-described facts: the fact that the City and County evidenced an intention that the Natomas region should become residential by the adoption of various community plans; the fact that the County proceeded to form the district on the recommendation of its own Health Officers; the fact that the County insisted on a 2500 acre minimum for the district; and the fact that Muir's compensation, including compensation for the costs of circulating the petitions, was paid by a County draft. None of these facts supports the conclusion urged by the plaintiff. Each will be discussed in turn.

The fact that both the City and the County anticipated that the area within which the plaintiff's land is located would become residential and commercial does not mean that either the City or the County initiated, promoted, or induced the installation of sewers, even if sewers are *sine qua non* to development. Planning decisions indicate what the planning entity will permit, but permission is not insistence. Indeed, in the instant case, no action was taken by anyone—the County, the City, or the plaintiff—to convert the plaintiff's property to residential and commercial uses in the decade following the installation of sewers, despite the City's apparent willingness to permit such development. The conclusions to be drawn from the adoption of the various community plans is that the City anticipated, even welcomed, residential and commercial development in the Natomas area and was content to rely upon the initiative of the landowners to bring that to fruition.

The fact that the County proceeded on the basis of the reports of its Health Officers does not mean that either the City or the County initiated, promoted, or induced the formation of the district. The reports of the Health Officers, and the proceedings thereon, cannot be taken out of context.

---

**4.** There has been no allegation that either the recommendation or the subsequent determination by the Board of Supervisors was the product of actual fraud. Therefore, the determination of a health necessity is final, § 2808.

The County Health Officers inspected the area, reported to the County, and recommended the installation of sewers only *after* the bond counsel on the project expressed some reservations about the formal and technical sufficiency of the petitions. The County's conduct is logically understood as responsive to the perceived problems with the petitions. Likewise, there is no question but that the various petitions expressed the genuine desires of the landowners to install sewers.[5]

The County's proceeding on the basis of the County Health Officers' reports must be understood in light of the Special Assessment Investigation, Limitation, and Majority Protest Act of 1931. The requirements of the Act are cumbersome and costly, and to a large extent duplicative of the provisions of the Improvement Act of 1911. It is abundantly clear that the primary purpose of proceeding on the basis of the Health Officers' reports was to avoid those cumbersome, costly, and duplicative procedures in light of the fact that the affected landowners had already unequivocally indicated their desire for the project.

The fact that the County insisted on a 2500 acre minimum area for the district does not mean that either the County or the City initiated, promoted, or induced the formation of the districts. The establishment of a minimum scale for the sewerage project is simply a reasonable exercise of the police power; the County could certainly have concluded that multiple, small districts were economically and politically disadvantageous, *see* "Special Districts in the State of California: Problems in General and the Consolidation of Sewer and Fire District Acts," *Final Report of the Assembly Interim Committee on Municipal and County Government*, (1959). The estab-

lishment of such a minimum can only be characterized as establishing the ground rules for the County's acquiescence in the landowners' proposal. In short, the establishment of criteria is not tantamount to direction or control, much less initiative. This Court is satisfied that had Muir been unable or unwilling to demonstrate the assent of the owners of less than 2500 acres to the formation of the district, the County would have done nothing to bring the district into existence.

The fact that Muir received his compensation through the County does not mean either the County or the City initiated, promoted, or induced the formation of the district. Muir received his compensation *through* the County, not *from* the County. Muir's compensation, including his compensation for preparing and circulating the petitions, was part of the "incidental expenses" of the project, and thus came out of the proceeds of the sale of the bonds, § 5024, *see, Hearings, supra,* September 24, 1962 (Testimony of Mr. Enoch Stewart). If anything, Muir was the employee or agent of the landowners, not the County.

The fact that the County required Muir to collect the signatures on the petition does not mean that either the County or the City initiated, promoted, or induced the formation of the district. On the contrary it is evidence of the County's essential indifference to the proposal. Once again, the County's requiring Muir to obtain the necessary signatures constitutes only the establishment of the ground rules for the County's acquiescence in the landowners' proposal.

Finally, the Court rejects the argument of the plaintiff that the use of the special assessment district was originally the idea of the County. The deposition testimony

---

5. This is well illustrated not only by the sequence of events, but also by the fact that the district ultimately formed, with one exception, consisted only of landowners who signed the petitions. The single exception was the property of a landowner who expressed his desire to be included in the district but indicated that he

was unwilling to sign a petition to that effect for fear of adverse tax consequences. Furthermore, the County accommodated one couple who had signed the petition and then reconsidered; that couple's property was excluded from the district.

of Ward Moul, on which the plaintiff bases this argument, does not support such a finding. Mr. Moul testified that one of Muir's clients wanted to subdivide his land, and the County insisted that *if* the land were to be subdivided, sewers had to be installed. A more obvious requirement would be difficult to imagine. As the County Health Officers noted in their reports, the drainage characteristics of the soil in the area make septic tanks utterly impractical for the number of persons that subdivision brings to a region. It does not follow from the County's insistence that potential developers satisfy obvious health requirements that the County induced or promoted the satisfaction of the requirements. The decision to proceed with or abandon plans to subdivide was always the landowners, not the County's.

Based on the foregoing discussion, this Court concludes that the defendants are entitled to an order specifying that the issue of the initiation of the formation of the Natomas Sewer Assessment District, and the defendants' promotion or inducement thereof is without substantial controversy, as the operative facts are not in dispute and admit as to only one conclusion. As a matter of law, neither the County nor the City initiated, promoted, or induced the formation of the District. The acts of the defendants can only be characterized as acts of acquiesence and accommodation.